INDEPENDENT, INC., d/b/a The Daily
Advertiser, Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

No. 24991.

United States Court of Appeals
Fifth Circuit.

Jan. 22, 1969.

Frederick S. Kullman, Kullman & Lang, New Orleans, La., for petitioner.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Elliott Moore, Robert S. Hillman, Nan C. Bases, Attys., N. L. R. B., Washington, D. C., for respondent.

Before DYER and SIMPSON, Circuit Judges, and CABOT, District Judge.

SIMPSON, Circuit Judge:

This action is before the Court upon the petition of Independent, Incorporated, to review and set aside an order of the National Labor Relations Board issued against the company on June 14, 1967. The Board has cross-petitioned for enforcement of its order, 165 NLRB 53. The Board found that the company had engaged in various activities violative of Section 8(a) (1) of the National Labor Relations Act and ordered the company to cease these unfair labor practices. In addition, the Board found that the Union (International Typographical Union, AFL–CIO, Local No. 832) represented a majority of the employees in an appropriate bargaining unit and that the company's refusal to bargain with the Union was not in good faith, thus violating Section 8(a) (5) of the Act. The Board set aside the results of an election held February 10, 1965, which the Union lost and ordered the company to bargain with the Union upon request.

The company argues that there is not substantial evidence to justify the

Board's finding of 8(a) (1) violations and that the Board acted improperly in setting aside the election. The company asserts that its refusal to bargain was in good faith and that in any event the Union's request to bargain was ambiguous as to unit description. Finally, the company believes that the Board selected an inappropriate bargaining unit.

 We may easily dispose of the controversy over the unfair labor practices found. There is more than substantial evidence in the record to justify the Board's finding. Universal Camera v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). Without recounting all the details, it is sufficient to observe that the record shows that Richard D'Aquin, the manager of petitioner's newspaper (The Daily Advertiser of Lafayette, Louisiana), embarked upon an obvious course of anti-union conduct in October of 1964, about a month after the Union had begun an organizational drive.[1] There is testimony that D'Aquin promised several employes raises, guaranteed job security and improved fringe benefits if they would not cooperate with the Union. D'Aquin asked two employees to let him know if they heard any Union talk and generally seemed intent on discovering the identity and operations of the Union leaders. There was testimony indicating D'Aquin on several occasions demanded an NLRB election, but refused to commit the company to abide by the results. Several employees told of both direct and veiled threats to their livelihood if they continued to support the Union. D'Aquin reportedly warned several workers that he would enjoin any strike and that he had ready replacements for anyone who walked out.[2] There is abundant evidence in the record from which the Board could conclude that the company waged an aggressive campaign both to entice employees to side with the company and to frighten employees away from the blandishments of the Union.[3] See Hendrix Mfg. Co. v. NLRB, supra; NLRB v. Dallas Concrete Co., 5 Cir. 1954, 212 F.2d 98, 100; NLRB v. Laney & Duke Storage Warehouse Co., 5 Cir. 1966, 369 F.2d 859, 864.

The company's only rebuttal to this evidence is that its witnesses were more worthy of belief than those of the Union. Aside from the fact that many of the Union's allegations were not refuted by company witnesses, it is a settled and by now a familiar principle that the decision of a trial examiner, affirmed by the Board, is not open to attack merely on grounds of allegedly erroneous credibility determinations. NLRB v. West Point Mfg. Co., 5 Cir. 1957, 245 F.2d 783; Martin Sprocket & Gear Company, Inc. v. NLRB, 5 Cir. 1964, 329 F.2d 417; Great Atlantic and Pacific Tea Company v. NLRB, 5 Cir. 1966, 354 F.2d 707. We enforce the Board's order directing petitioner to cease the unfair labor practices found.

We turn now to the more important controversy in this litigation: the propriety of the Board's action setting aside the election of February 10, 1965, and its order directing the petitioner to bargain with the Union upon request. Some history of the events leading to the

1. Of course, the company has a legal right to "made no bones about its opposition to the Union." Hendrix Mfg. Co. v. NLRB, 5 Cir. 1963, 321 F.2d 100, 103. However, the Board is entitled to consider emphatic anti-union attitudes as "background" against which to measure the impact on employees of management's statements and conduct. 321 F.2d at 103–104, n. 6 p. 104.

2. Employee Melancon testified that he was warned: "A union card will do you no good walking the street." The newspaper's sports editor, a supervisory employee, remarked to at least one employee that he "didn't want to see anybody get hurt."

3. Several employees testified that after the union campaign began, they were required to help fill out questionnaires of an extremely personal nature. The questions included such matters as what kind of checking account they maintained and whom they would turn to in the event of trouble. Previously, the company had required only that its employees supply name, address and phone number.

current impasse in labor-management relations is necessary to put the election dispute in perspective. The Union began its organizational drive at petitioner's newspaper in September, 1964. All through October and early November, despite the anti-Union activities of D'Aquin and other supervisory personnel, the Union gained adherents. After obtaining a majority among the employees in the composing and press room departments at the Advertiser, the Union made a formal request to bargain in a letter to D'Aquin on November 10, 1964. D'Aquin responded by seeking legal advice and then agreed to meet with Union organizer Saltarelli at a Lafayette restaurant in late November. The Union representative again informed D'Aquin that a majority of the employees wished to be represented by the Union. D'Aquin asked for more time.

The employees became increasingly restless and voted to strike if D'Aquin again refused to bargain with them. On December 2, 1964, a contingent of employees approached D'Aquin a final time about recognition for the Union. They told D'Aquin that if he doubted their majority, they would submit to an election on the spot to be conducted by a neutral party, a priest. D'Aquin refused saying that he had petitioned the Board for an election and that was the only "legal" way. He expressed doubts that the Union represented a majority of the employees. In response, Saltarelli observed that only "five or six" regular employees were at work and that the rest were prepared to strike. Even presented with this graphic proof of Union strength, D'Aquin refused to accede to the Union's bargaining request. After this confrontation, twenty-three employees struck and the picket lines remained through the Board-conducted election on February 10, 1965.

 The Board upheld the decision of its trial examiner to set aside the election. Before examining the Board's determination, it is appropriate to note that judicial review of Board election decisions is narrowly restricted. The Board has wide discretion, in keeping with its administrative expertise, in the conduct and supervision of representation elections. Neuhoff Bros. Packers, Inc. v. NLRB, 5 Cir. 1966, 362 F.2d 611; Pepperell Mfg. Co. v. NLRB, 403 F.2d 520, 5 Cir. 1968 [November 13, 1968]. Our review is necessarily limited to a determination of whether the Board reasonably exercised that discretion. Pepperell Mfg. Co. v. NLRB, supra. The Board is clearly in a better position than this Court to "decide whether the conduct charged reasonably tends to interfere with the voter's free choice." [4] NLRB v. Laney & Duke Storage Warehouse Co., supra, 369 F.2d at 864; NLRB v. Dallas City Packing Co., 5 Cir. 1958, 251 F.2d 663.

 Bearing the above principles in mind, we now examine the basis of the Board's conclusion. At the outset, it should be noted that sixty-three ballots were cast in this election, yet only six escaped challenge by either the Union or the company.[5] While this is perhaps a good indication of the indecisiveness of the election, a large number of challenged ballots in itself does not invalidate an otherwise properly conducted election. The Board relies primarily on five incidents to justify its order setting the election aside. Only two (Union Objection No. 4) were specifically included by the Union in its formal objections to the election. Petitioner thus asserts that the Board is limited to an examination of formal objections alone in reviewing the conduct of the election. Clearly, such a rule would strip the Board and its regional representatives of all investigative

---

4. This Court has stated that not just any employer misconduct will support a Board finding of interference with the free choice of employees. To warrant setting aside an election, conduct "must be so related to the election as to have had a probable effect upon the employees' actions at the polls." NLRB v. Zelrich Company, 5 Cir. 1965, 344 F.2d 1011, 1015.

5. All six unchallenged ballots were cast against the Union.

power and would greatly hamper the Board in employing the expertise so often relied on by the parties and the courts. No restrictions of this nature can be found either in the Act or the Board's regulations, and the courts have agreed that the Board is not precluded from a consideration of matters other than those brought to its attention by the parties. NLRB v. Dal-Tex Optical Company, 5 Cir. 1962, 310 F.2d 58; NLRB v. Realist, Inc., 7 Cir. 1964, 328 F.2d 840, cert. den. 377 U.S. 994, 84 S.Ct. 1921, 12 L.Ed.2d 1046.

 The five matters relied upon by the Board all occurred on or after December 1, 1964, the date Independent filed a petition for election. This comports with the rule formulated by the Board that it will consider only conduct occurring on or after the date of filing an election petition in determining whether an election should be set aside. Ideal Electric and Mfg. Co., 134 NLRB 1275 (1961).[6] The evidence shows that on December 1, 1964, D'Aquin had a conversation with Gilbert Lancon, a leading employee in the Union's organization drive. He informed Lancon in effect that the Union campaign was largely responsible for a delay in wage increases and improved fringe benefits that the company had planned. On December 2, D'Aquin spoke with Joseph Melancon, another employee favoring the Union. Melancon testified that D'Aquin offered him a raise and a promotion as soon as the Union troubles were over. The last confrontation between the Union negotiating committee and D'Aquin also occurred on December 2, immediately prior to the strike. Although the negotiators

pointed out to D'Aquin how few of the men had come to work and offered to submit to an immediate election conducted by a nonpartisan, D'Aquin refused to negotiate or agree to an election at that time. He reaffirmed the company's animus toward the Union employing such epithets as "winos" and "communist tactics" in describing the members and methods of the Union. Testimony was adduced indicating that D'Aquin later approached employees Dore and Benoit as they manned the picket line and urged at least one of them to abandon the strike and return to work.

After all the above tactics (comprising four of the incidents relied on by the Board) failed to have any effect on the united strike front, the company sent a letter on December 3 to each striker and his wife urging them to return to work and telling them that the newspaper would continue to publish with replacement employees. The letter fixed December 5 at 7 A.M. as a deadline for returning to work.

 The company urges that none of the incidents described above constituted unfair labor practices. Moreover, it contends that none of the incidents could have had a significant impact on the election. We do not agree that these matters had no impact on the election. More precisely, we think that, considered together, they furnish substantial evidence upon which the Board could have based its order setting aside the election. These incidents included inducements to abandon a strike, promises in return for giving up Union activity, a refusal to bargain and a letter to the striking employees and their wives

6. In examining the employer's conduct on and after December 1, 1964, we cannot, however, ignore the context in which it occurred. While only post November 30, 1964 incidents may be considered as grounds for setting aside the election, they must be evaluated in light of the prevailing relations between employer and employee. NLRB v. Clearfield Cheese Co., 3 Cir., 1963, 322 F.2d 89, 93; Rockwell Manufacturing Co., Kearney Div. v. NLRB, 7 Cir. 1964, 330 F.2d 795, 797.

This Court dealt with a somewhat analogous situation in NLRB v. Dell, 5 Cir. 1960, 283 F.2d 733. There, we noted that while certain statements could not be considered unfair labor practices because they occurred outside a limitation period specified in the Act, they could be relied on for background purposes in evaluating conduct occurring within the limitation period. 283 F.2d at 736.

giving them less than forty-eight hours to reconsider.[7] It is immaterial that the matters relied upon may not necessarily rise to the dignity of unfair labor practices. NLRB v. Shirlington Supermarket, 4 Cir. 1955, 224 F.2d 649, 652. "It is not necessary that conduct which interferes with the freedom of choice in an election actually constitute an unfair labor practice." NLRB v. Tennessee Packers, Inc., Frosty Morn Division, 6 Cir. 1967, 379 F.2d 172, 181. A significant number of employees out of a relatively small group were exposed to D'Aquin's conduct. We conclude, viewing these incidents for their cumulative effect, that they furnish a substantial basis for the Board to set aside this election.[8] Howell Refining Co. v. NLRB, 400 F.2d 213, 5 Cir. 1968 [August 12, 1968, at 14]; Home Town Foods, Inc. v. NLRB, 5 Cir. 1967, 279 F.2d 241, 244.

█ The Board not only set aside the February 10 election, but directed the petitioner to bargain with the Union upon request. This is proper if the Union demonstrated its majority status prior to the election. Here, the Union clearly had done so and any reduction in its majority position can be fairly attributed to the unfair labor practices of petitioner. NLRB v. Harris-Woodson Co., 4 Cir. 1947, 162 F.2d 97, 100. The Board was on solid ground when it ordered the petitioner to bargain with the Union. Holding another election would merely give the company more time to continue its attempts to dissipate what at one time was a substantial majority for the Union. The Board need not allow the company to profit by its own misdeeds. Irving

Air Chute Co. v. NLRB, 2 Cir. 1965, 350 F.2d 176.

█ While the Board apparently does not consider a prior bargaining request by the Union a prerequisite for its order to bargain. Irving Air Chute Co., v. NLRB, 149 NLRB 627, 629 (1964), enfd., 2 Cir. 1965, 350 F.2d 176; nevertheless, the Union made several requests during its campaign at petitioner's newspaper. The company argues that the Union's request by letter of November 10, 1964, was ambiguous in describing the unit it purported to represent. We do not agree. The letter contained the following language in relevant part:

> " * * * has been authorized in writing by a substantial majority of the employees in the mechanical departments of your firm to represent them for purposes of collective bargaining * * *. The mechanical department operations include all mechanical operations from the receipt of the copy by composing room employees to the finished product is ready for delivery to the customer. All journeymen and apprentice employees performing composing room work which includes Teletypesetter operations and proofreading; photoengravers, pressroom and Stereotype employees are included in the collective bargaining group. * * "

The essence of the company's contention here is that it construed "mechanical departments" and "to the finished product is ready for delivery to the customer" as language either including or not definitely excluding mail room employees. Petitioner might find support in this language if these descriptions stood alone.

7. The company insists that the letter to the strikers was no different than one found to be within permissible bounds of employer communication to strikers in Orange Premium Stamps, 127 NLRB 1491 (1960). The letters are similar. However, the letters in *Orange Premium Stamps* went to the strikers individually and not their wives. Further, they were given four days to return to work rather than less than forty-eight hours. It is, of course, unnecessary to differentiate the *Orange Premium Stamps* letter since we are considering this letter to the strikers in derogation of the Union's majority status only for its cumulative effect.

8. Indeed, it may be that if any *one* of the grounds upon which the Board based its action was reasonable, we should find that the Board was warranted in setting aside the election. NLRB v. Realist, Inc., supra at 842. We need not worry about this problem in the case sub judice where there is more than one reasonable ground to justify the Board's action.

But, they manifestly do not. Following its general description of the bargaining unit, the Union proceeded to enumerate exactly which employees it purported to represent. A reasonable newspaper publisher could not have been confused reading the letter in its entirety. We hold that the letter was a specific request to bargain for the employees in the listed categories at petitioner's plant and that mail room employees were definitely not included in the unit.

Failing in this argument, petitioner contends that a unit without mail room employees is not appropriate. This is an unusual position for petitioner in that it is a member of the Thompson newspaper chain, many of whose constituent newspapers deal every day with mechanical department units that do not include mail room employees. Even if we agreed with petitioner that a larger bargaining unit would be more appropriate, we would not necessarily be bound to hold that a smaller unit is inappropriate. The Board has wide discretion in determining appropriate bargaining units, and this Court will not "displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." Universal Camera v. NLRB, supra at 488, 71 S.Ct. at 465; see also NLRB v. Davis Cafeteria, Inc., 5 Cir. 1968, 396 F.2d 18; Monroe Manufacturing Co., v. NLRB, 5 Cir. 1968, 403 F.2d 197 [October 30, 1968].

Lastly, the company argues that the Board's order directing it to bargain is not proper because the record indicates that D'Aquin had a good faith doubt as to the Union's pre-election majority status. We find, however, that there could have been no doubt of the Union's majority status and thus any doubt entertained was not in good faith. Petitioner's manager, D'Aquin, stated that he had heard people in the composing and press rooms saying they did not want to belong to a Union. It is conceded that D'Aquin did not hear such expressions during the critical period in November

and December when the Union sought recognition. This uncorroborated testimony of remote anti-union sentiment among unidentified employees provides no basis for any doubt as to the Union's majority status when it made its request to bargain.

D'Aquin further testified as to vague reports he had heard concerning Union threats to "squeeze" employees out of their jobs if they did not join the Union. Only one employee corroborated D'Aquin's statement, and she testified she did not tell D'Aquin of any threats until after the strike had begun. Nothing imparted to D'Aquin after the strike was underway could possibly have contributed to any good faith doubt on his part a month earlier.

The major stumbling block to petitioner's theory is that the record clearly shows that more than once the Union volunteered to prove its majority status by having an impartial religious leader conduct an informal election. D'Aquin refused these requests. Moreover, there is no showing that D'Aquin ever requested to examine the Union's authorization cards. There is no issue raised here as to the validity of the cards, the Union's solicitation methods or the state of mind of employees who signed the cards. This Court, of course, is wary of enforcing Board orders to recognize a Union which attempts to establish a majority status by a proliferation of cards rather than an electoral victory. Cf. NLRB v. Southland Paint Company, Inc., 5 Cir. 1968, 394 F.2d 717; NLRB v. Dan River Mills, Inc., 5 Cir. 1960, 274 F.2d 381. Nevertheless, there is no question that the Board has the power to direct an employer to recognize and bargain with a Union on the basis of an adequately demonstrated majority even though the Union might have lost a representation election. Irving Air Chute Co. v. NLRB, supra.

Petitioner's most compelling argument, that it believed the unit arguably included mail room employees, from whom there was no proof of pro-Union sentiment, is foreclosed by D'Aquin's

**210**

conduct. D'Aquin held small meetings with different employee groups on at least two occasions in November in order to set forth the company's views concerning the desirability of the Union. It is undisputed that no mail room employees were included in these group discussions. In fact, there is not one instance in this record where D'Aquin sought to discourage Union activity among mail room employees. We, therefore, conclude that there could have been no genuine doubt as to the Union's majority status. Certainly there could have been no doubt on December 2, 1964, when twenty-three of the thirty-four employees comprising the composing and press room personnel at petitioner's small newspaper left their jobs and established a picket line. NLRB v. Shurett, 5 Cir. 1963, 314 F.2d 43.

It follows from what we have written that the Board was justified in entering its order directing petitioner both to cease its unfair labor practices and to bargain with the Union upon request. Independent's petition to set aside is denied. The Board's order is enforced.

Enforced.