**HOME TOWN FOODS, INC., d/b/a Foremost Dairies of the South, Petitioner-Cross-Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent-Cross-Petitioner.**

No. 26487.

United States Court of Appeals
Fifth Circuit.

June 18, 1969.

Rehearing Denied and Rehearing En Banc Denied Oct. 1, 1969.

William F. Ford, John Bacheller, Jr., William W. Alexander, Jr., Fisher & Phillips, Atlanta, Ga., for petitioner-cross-respondent.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Washington, D. C., Walter C. Phillips, Director, 10th Region, Atlanta, Ga., Glen M. Bendixsen, Atty., N.L.R.B., Washington, D. C., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Ian D. Lanoff, Atty., N. L.R.B., for respondent-cross-petitioner.

Before RIVES, BELL and DYER, Circuit Judges.

RIVES, Circuit Judge:

■ This representation election "test case"[1] is before us for the second

1. The NLRA § 8(a) (5), 29 U.S.C. § 158 (a) (5), refusal to bargain unfair labor practice case is virtually conceded *if* the Board's representation determination is upheld. In order to secure judicial review of the otherwise non-final NLRA § 9, 29 U.S.C. § 159, determination, however, the Company must refuse to bargain with the representative it considers incorrectly certified and then contest the consequent unfair labor practice cease-and-desist final order promulgated under authority of NLRA § 10, 29 U.S.C. § 160. *See generally* 2 CCH Lab. Law Rep. ¶¶ 2590, 3060.

time. *See* Home Town Foods, Inc. v. NLRB, 5 Cir. 1967, 379 F.2d 241, *denying enforcement and remanding for an evidentiary hearing* 160 NLRB 8 (1966). Home Town Foods petitions this Court to review and to set aside the Supplemental Decision and Order of the NLRB, 172 NLRB No. 126 (1968); the Board cross-petitions for enforcement. NLRA § 10(e), (f), 29 U.S.C. § 160(e), (f).[2]

■■■ Our scope of review is limited to ascertaining whether there is substantial evidence on the record considered as a whole to support the Board's decision and order. 29 U.S.C. § 160(e)

and (f). Universal Camera Corp. v. NLRB, 1951, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456; NLRB v. Houston Chronicle Publishing Co., 5 Cir. 1962, 300 F.2d 273.[3] While we also recognize that the Board has broad discretion in adopting procedures to govern the election process, we find no conflict between the breadth of discretion afforded the Board in its promulgation of procedures and the substantial evidence rules used by the courts to review applications of those procedures.

"There is no conflict or contradiction between the substantial evidence rule determinative of the scope of re-

---

2. The Company lost the election 52–45, with 9 ballots challenged. Seven such challenges were sustained on the basis of ineligibility to vote; 2 were never resolved, never opened, or never tabulated on the Regional Director's belief that they could not affect the election outcome. *See* 29 C.F.R. § 102.69(c). However, the Company did not choose to make a ballot challenge case. Rather, it relies on allegations of "specific evidence of specific events from or about specific people," NLRB v. Douglas Co. Elect. Membership Corp., 5 Cir. 1966, 358 F.2d 125, 130, claiming that pre-election misconduct by union supporters and election day misconduct by the union organizer, the union supporters, and the Board agent destroyed the requisite "laboratory conditions." General Shoe Corp., 1948, 77 N.L.R.B. 124, 127. The Regional Director conducted an ex parte administrative investigation, denied the Company objections, and certified the union (Retail, Wholesale & Department Store Union, AFL–CIO) as exclusive bargaining agent. 29 C.F.R. § 102.69(c). The Company's request for Board review was summarily denied, without decision, on the theory that it raised "no substantial issues warranting review." 29 C.F.R. § 102.67(c). When the Company refused to bargain, unfair labor practice charges were filed. The Board and its Trial Examiner applied its rule that a representation question previously decided in a § 9 proceeding may not be relitigated in a subsequent unfair practice § 10 proceeding. 29 C.F.R. § 102.67(f); *see* 2 CCH Lab. Law Rep. ¶ 3060.84. The election objections, thereupon, were foreclosed from consideration and the findings and cease-and-desist order stemming therefrom were the result of no more

than ritualistic adherence to procedural formalities. We reviewed the election objections on the original Company petition for review and cross-petition for enforcement. NLRA § 10(e), (f), 29 U.S.C. §§ 160(e), (f). We denied enforcement after observing that "[v]iewed cumulatively, we have no doubt that the employer's objections charge that the election was conducted in less than the laboratory conditions so often promised by the Board and required by the Courts." 379 F.2d at 244. The Board was, therefore, instructed to conduct an evidentiary hearing on the merits of the Company's objections. *See* Southwestern Portland Cement Co. v. NLRB, 5 Cir. 1969, 407 F.2d 131; NLRB v. Monroe Auto Equip. Co., 5 Cir. 1969, 406 F.2d 177, *cert. denied* 393 U.S. 934, 89 S.Ct. 293, 21 L.Ed.2d 270; NLRB v. Genesco, Inc., 5 Cir.1969, 406 F.2d 393; NLRB v. Smith Industries, Inc., 5 Cir. 1968, 403 F.2d 889; Howell Refining Co. v. NLRB, 5 Cir. 1968, 400 F.2d 213; NLRB v. Ortronix, Inc., 5 Cir. 1967, 380 F.2d 737; United States Rubber Co. v. NLRB, 5 Cir. 1967, 373 F.2d 602.

3. Our review here of a directed election case is not affected by suggestions which might lead to a narrower scope of judicial review in consent election cases. *See generally* Annot., 36 A.L.R.2d 1170, 1183, (1954). *Compare* Carlisle Paper Box Co. v. NLRB, 3 Cir. 1968, 398 F.2d 1, 5–6 *and* Manning, Maxwell & Moore, Inc. v. NLRB, 5 Cir. 1963, 324 F.2d 857, 858 *with* NLRB v. Sidran, 5 Cir. 1950, 181 F.2d 671, 673. *See also* Pepperell Mfg. Co. v. NLRB, 5 Cir. 1968, 403 F.2d 520, 522, *cert. denied* May 26, 1969, 395 U.S. 922, 89 S.Ct. 1774, 23 L.Ed.2d 238.

view and the principle whereunder the Board is entrusted with wide discretion in establishing the procedures and safeguards necessary to insure the fair and free choice of bargaining representatives as enunciated in National Labor Relations Board v. A. J. Tower Co., 1946, 329 U.S. 324, 330, 67 S.Ct. 324, 91 L.Ed. 322. These rules do not conflict because they affect differing spheres of activity. The Board's wide discretion lies in the initial promulgation of rules and regulations, while the court exercises its duties in reviewing decisions involving application of the Board's rules. Judicial review in these cases is not concerned with the wisdom of the Board's policy but must determine whether the record as a whole supports the findings and conclusions respecting compliance with the policies, rules and regulations promulgated by the Board.

"Unless or until Congress changes the language of the statute or the Supreme Court changes its interpretation of the application of the statute, this court is bound by the rule of the Universal Camera case."

Celanese Corporation of America v. NLRB, 7 Cir.1961, 291 F.2d 224 at 225. Accord, NLRB v. Bata Shoe Company, 4 Cir. 1967, 377 F.2d 821, 827. Compare Independent, Inc. v. NLRB, 5 Cir.1969, 406 F.2d 203. Finally, we note that this Court must review, on an *ad hoc* basis, the fairness of the Board's application of its chosen standard. Applying this standard of review to the supplemental decision and order now before us, we conclude that the Board has misapplied its orthodox "laboratory conditions" standard for evaluating the fairness of election campaign conduct and has thereby denied the production and maintenance unit employees of the Company's Sylacauga plant the requisite "free and untrammeled choice for or against a bargaining representative." General Shoe Corp., 1948, 77 NLRB 124, 127. *Cf.* LMRA §§ 7, 9(a) and 9(c) (1), 29 U.S.C. §§ 157, 159(a), and 159(c) (1). We deny enforcement.[4]

## I.

A former counsel to NLRB member Jenkins has written that:

"It is in the American tradition to conduct elections with more vigor than restraint and elections to determine the bargaining representative of employees are no exception. The period between the filing of a petition and the election may be a brief one but it is crucial to the parties and fascinating to the spectator. Emotions run high and temperance in speech and conduct is not the rule. It is not unusual therefore for the Board, despite all the safeguards it has established, to receive loud cries of 'foul' from the loser."

Funke, Board Regulation of Pre-Election Conduct, 36 Tex.L.Rev. 893, 895 (1958). Congress has vested in the Board the authority to investigate and resolve objections to election conduct. LMRA § 9, 29 U.S.C. § 159. The Board has adopted appropriate evaluation procedures. 29 C.F.R. § 102.69. *See generally* 2 CCH Lab.Law Rep. ¶¶ 2701, 2790, 2791, 2792. The Board has recently acknowledged that it must "closely guard the integrity of its elections so that employees may exercise the freedom of choice contemplated by the Act and thereby have a full opportunity to enjoy its other benefits." Oak Mfg. Co., 1963, 141 NLRB 1323, 1324.

In General Shoe Corp., *supra* at 127, the Board established its landmark standard for evaluating election campaign conduct:

"Conduct that creates an atmosphere which renders improbable a free

---

4. Since we deny enforcement on the basis of the Board's application of its own "laboratory conditions" standard, we need not consider the implications of the Board's application of its no relitigation rule, 29 C.F.R. § 102.67(f), in the § 10 proceeding notwithstanding its denial of review in the § 9 proceeding. *But see* Pepsi-Cola Buffalo Bottling Co. v. NLRB, 2 Cir. 1969, 409 F.2d 676.

choice will sometimes warrant invalidating an election, even though that conduct may not constitute an unfair labor practice. An election can serve its true purpose only if the surrounding conditions enable employees to register a free and untrammeled choice for or against a bargaining representative.

\*  \*  \*  \*  \*  \*

"In election proceedings, it is the Board's function to provide a laboratory in which an experiment may be conducted, under conditions as nearly ideal as possible, to determine the uninhibited desires of the employees. It is our duty to establish these conditions; it is also our duty to determine whether they have been fulfilled. When, in the rare extreme case, the standard drops too low, because of our

fault or that of others, the requisite laboratory conditions are not present and the experiment must be conducted over again."

█ The "laboratory conditions" test represents an ideal atmosphere in which a free choice may be made by employees, protected from interference by employer,[5] union,[6] Board agent,[7] or other parties.[8] As to any conduct objected to as interference, the critical Board determination is whether the employees were permitted to register a free choice. *Cf.* NLRB v. Southland Paint Co., 5 Cir. 1968, 394 F.2d 717, 727, and the case from which it quotes, NLRB v. Lake Butler Apparel Co., 5 Cir. 1968, 392 F. 2d 76, 82 ("The struggle is between the employer and the union, but the right to select is the employees.")[9]

5. *See, e. g.,* Raytheon Co., 173 N.L.R.B. No. 10, 1968–2 CCH NLRB ¶ 20,216 (employer solicited employee grievances and offered "vote no" buttons); Anchor Coupling Co., Inc., 168 N.L.R.B. No. 40, 1968–1 CCH NLRB ¶ 21,908 (supervisor contact with only 3 of 120 employees); International Mfg. Co., Inc., 167 N.L.R.B. No. 105, 1968–1 CCH NLRB ¶ 21,814 (supervisor statements to 6 of 730 employees): Nationwide Papers, Inc., 147 N.L.R.B. 1030, 1964 CCH NLRB ¶ 13,226 (warning of drastic economic detriment); Great A & P Tea Co., Inc., 140 N.L.R.B. 133, 1962 CCH NLRB ¶ 11,839 (employer interview of employees away from work station); Plochman & Harrison-Cherry Lane Foods, Inc., 140 N.L.R.B. 130, 1962 CCH NLRB ¶ 11,832 (showing of movie "And Women Must Weep"); Trane Co., 137 N.L.R.B. 1506, 1962 CCH NLRB ¶ 11,450 (withheld $5 from regular paycheck and immediately thereafter returned same to show effect of union dues).

6. *See, e. g.,* Dolco Pkg. Corp., 1969, 174 N.L.R.B. No. 16, 1968–2 CCH NLRB ¶ 20,470 (union misrepresentation of contract terms with unionized area employers); Rebmar, Inc., 1968, 173 N.L.R.B. No. 215, 1968–2 CCH NLRB ¶ 20,441 (union misuse of official election notices); Cranbar Corp., 1968, 173 N.L. R.B. No. 200, 1968–2 CCH NLRB ¶ 20,416 (union inference of management

preference for union too late for rebuttal); K-Mart, 1968, 173 N.L.R.B. No. 84, 1968–2 CCH NLRB ¶ 20,290 (substantial wage data misrepresentation by union); Knapp-Sherrill Co., 1968, 171 N.L.R.B. No. 171, 1968–2 CCH NLRB ¶ 22,597 (union threats of job loss to non-supporters); Star Expansion Industries Corp., 1968, 170 N.L.R.B. No. 47, 1968–1 CCH NLRB ¶ 22,243 (union electioneering); Milchem, Inc., 170 N.L.R.B. No. 46, 1968–1 CCH NLRB ¶ 22,245 (last minute conversation with voters by union agent.)

7. *See, e. g.,* Austill Waxed Paper Co., 169 N.L.R.B. No. 169, 1968–1 CCH NLRB ¶ 22,192 (ballot box left unsealed and unattended from two to five minutes); Athbro Precision Eng. Co., 166 N.L.R.B. No. 116, 1967 CCH NLRB ¶ 21,681 (Board agent drank beer with union agent between shifts of employee voting; integrity of ballot box not questioned).

8. *See, e. g.,* Henry I. Siegel, Inc., 165 N.L. R.B. No. 56, 1967 CCH NLRB ¶ 21,483 (interference by anti-union townspeople); Diamond State Poultry, 1953, 107 N.L.R.B. No. 3 (conduct outside polls on election day by workers from neighboring plant).

9. The Company accuses the Board of applying a "double standard"—one test for *employer* campaign conduct, another

## II.

In our original consideration of this case, we noted that the *alleged* pre-election and election day misconduct,[10] if proven, left no doubt that the election should have been set aside on the basis of deterioration of the requisite "laboratory conditions." 379 F.2d at 244. See Electra Mfg. Co. v. NLRB, 5 Cir. 1969, 408 F.2d 570; Neuhoff Bros. Packers, Inc. v. NLRB, 5 Cir. 1966, 362 F.2d 611, *cert. denied* 386 U.S. 956, 87 S.Ct. 1027, 18 L.Ed.2d 106; NLRB v. Houston Chronicle Pub. Co., 5 Cir. 1962, 300 F.2d 273.

Moreover, we remanded with instructions that (1) the conduct to which the Company objected must be considered cumulatively rather than as isolated individual incidents; (2) while an *objective* evaluation is normally the basis for determination whether interference occurred sufficient to require setting aside an election, "*subjective* evidence of fear and coercion, however, may carry the day *as well*," 379 F.2d at 244 (emphasis added); and finally (3) all coercive acts need not be shown to be attributable to the union, rather than rank-and-file supporters.

## III.

Nine witnesses testified on behalf of the Company, and in varying degrees substantiated the validity of every objec-

for union activities. Such an accusation is not novel. *See* Note, National Labor Relations Act Elections: Post-Election Objections, 38 Temp.L.J. 288 (1965). The rationale for such criticism has been concisely summarized:

> "In evaluating *employer* conduct the Board has indicated that more stringent restrictions will be applied than in the case of union conduct, reasoning that an employer's statements to his employees are going to have a greater influence than if those same statements were made by a union because the employer controls future wages and working conditions and could more readily translate his statements into reality. (Citations omitted.) Management anti-union expressions are 'uttered in that locus of final authority' giving them more impact. General Shoe Corp., 97 NLRB 499, 502 (1951)."

*See also* Samoff, NLRB Elections: Uncertainty or Certainty, 117 U.Pa.L. Rev. 228 (1968).

We find it unnecessary and unwise to pass upon this issue since we review only the Board determination currently before us. It would seem to us, however, that the Board should apply a *single* standard against which it will measure the campaign conduct of *all* parties who might have interfered with employee free choice, weighing the conduct of each individual party according to the particular power he might possess. Such a test makes adequate allowance for setting aside an election whether, in a given context, either the employer or the union is the dominant party. Moreover, it permits an election to be set aside where neither is at fault, but where the Board agent or some outside party has interfered.

10. The Company objected to the following *pre-election* conduct: (1) participation in initial organizational efforts by a supervisor; (2) threats to kill or beat two anti-union employees made by named union advocates in the presence of other employees of unknown persuasion; (3) sabotage (sugar in the fuel tank) of the truck driven by one of the two threatened union opponents; and (4) widespread circulation of rumors that a vote against the union would cost an employee his job "if the union went through." The Company also objected to the following *election-day* occurrences: (1) election location in the glass-front portion of the building, compared to a "goldfish bowl"; (2) Board agent conduct in admitting the union organizer to the polling place after voting started, in leaving the polling place with him for several minutes, and in authorizing into the polling area a number of challenged voters who were permitted to await a turn to vote approximately three feet away from and in front of the booth instead of in line; (3) presence outside the polls of employees from another company, who, while on strike, had participated in the Home Town organizational campaign and who, on election day, parked 14 feet from the polls a vehicle with a "vote yes" sign in its window; and (4) electioneering by one of the challenged voters as he stood near the booth (all of the challenged voters were union advocates who had been validly fired, *see* note 2, *supra*); (5) placement of the challenged voters in a

tion but one[11] made by the Company. Three witnesses testified on behalf of general counsel: one, a challenged voter who stood in front of the voting booth during the election, merely stated that *he* could not see into the booth so as to determine how any voter cast his ballot;[12] the other two were concerned only with absolving the union organizer from any election day misconduct in the area of the polling place. The Company's prima facie case of pre-election threats, sabotage, rumors, and of election day irregularities was largely uncontroverted by General Counsel.

The Trial Examiner, however, concluded that:

> "It cannot be said that in this case the conduct * * * during the election campaign period was of such an aggravated character as to create a general atmosphere of fear and reprisal rendering a free expression of choice of representatives impossible."

To reach this conclusion on the evidence presented necessitated (1) that the Trial Examiner eliminate from consideration part of the threats and all of the rumors, as well as the supervisor participation, by ruling that the Company failed to show such events occurred during the critical campaign period; (2) that he discount the various election day events, considering each in isolation, as resulting in "baseless fear"; and (3) that he discredit the testimony of one employee found by the Board to have

been threatened on three separate occasions, and thereby find that there was no evidence to establish that fear *actually* affected any vote.

The Board adopted, with substantial modifications,[13] the findings, conclusions and recommendations of the Trial Examiner. Notwithstanding its findings, the Board concluded that there was no basis for setting aside the election. The rationale underlying the determination was straight-forward:

> "We are unable to conclude that these circumstances justify the conclusion that the requisite laboratory conditions for the conduct of a free election were not present. *Applying the test set forth by the Court,* as summarized above, *there is no evidence that any of the above factors resulted in subjective reactions which interfered with the vote of any employee other than Stegall, and his ballot could not affect the result.*

> "The Court expressed the view that if the entire atmosphere in which the election was held was tainted, it would be immaterial that the conduct creating that atmosphere was not directly attributable to the Union. However, it seems apparent to us that the Court's opinion must be interpreted as dispensing with a showing of responsibility by one of the parties only where the conduct involved is *of so serious a nature* that it could only result in widespread confusion and fear of

---

position in front of the booth in such a fashion that some employees feared their ballots would not be or were not secret.

11. Although there was evidence that one of the challenged voters made some sign to an employee who was waiting in the voting line, the substance of his conduct was never proven to constitute "electioneering."

12. Of course, his testimony does not altogether erase the possibility that one of his contemporaries standing three feet in front of the booth may have been able to see into the booth. Nor does his testimony neutralize the fact that, regardless of whether the challenged union supporters could *actually* see into the booth, the

mere presence of these union adherents in a position potentially threatening ballot secrecy resulted in some apprehension on the part of uncommitted employees.

13. In fact, the "modifications" amounted to a departure from the Trial Examiner's findings of fact. The Board substituted its own narration of the facts which, in effect, conceded the validity of the Company allegations of pre-election threats and rumors and substantiated (except for the ballot secrecy objection) the accuracy of the Company's description of the election-day events. Hence, the findings of the Board virtually acknowledged the truth of the Company's allegations.

reprisal which would render impossible a rational, uncoerced choice by employees. *Here, the incidents which exceeded permissible bounds were merely the three involving Stegall and the coldroom employees, of which all were very limited in nature and only one was known to two other employees.* We do not think that this amount of misconduct was what the Court considered sufficient for the application of the criterion it stated. Accordingly, we adhere, for the reasons stated, to our prior holding.

"In view of the above, we find that there is no basis for setting aside the election in this case." (Emphasis added.)

■ Concerning the cumulative facts proved in the instant case and in the light of the "laboratory conditions" standard and the express directions contained in our original decision on remand, the Board order is unsupportable on the record considered as a whole. Universal Camera Corp. v. N.L.R.B.,

1951, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456. The Board, not the Courts, adopted as the measure of election fairness the "laboratory conditions" standard and the *objective* (or inferential) conduct impact appraisal method.[14] This Court merely noted on remand that *subjective* evidence *may* carry the day as well. 379 F.2d at 244. The two evaluation methods are not mutually exclusive. This Court has previously held that, where the Board has "promulgated" a standard governing conduct under the LMRA,[15] "(s)uch policies are controlling until the Board announces a change and its reasons for the change." Delta Drilling Co. v. NLRB, 5 Cir. 1969, 406 F.2d 109, 113; Rayonier, Inc. v. NLRB, 5 Cir. 1967, 380 F.2d 187, 189.[16]

Because in the instant case the Board acquiesced in pre-election misconduct by the union supporters and in election day misconduct by the union agent, union supporters and the Board agent, which, viewed cumulatively, obviously resulted in "the standards of election campaign-

14. The inferential impact evaluation method was classically illustrated in a recent Board decision setting aside an election on the basis of supervisor contact with a mere 6 out of 730 potentially eligible worker-voters before an election in which the union was rejected by a 382-272 vote:

"(T)he restraining effect of coercive conduct is not limited to employees directly involved. Rather, the Board and courts have long recognized that employer interrogation and threats concerning union activity during a pre-election campaign are likely to receive prompt and wide circulation. Therefore, to evaluate properly the probable effect of conduct which is coercive in nature, the number of employees directly involved cannot serve as a determinative factor. The controlling factor here is whether the conduct involved tends to interfere with a free and uncoerced choice by the employees."

International Mfg. Co., 1967, 167 N.L.R.B. No. 105, 1968-1 CCH NLRB ¶ 21,814 at 28,591.

15. We are unconcerned with whether such a standard is the product of the Board's adjudicatory or its quasi-legislative function. *Cf.* NLRB v. Wyman-Gordon Co.,

1969, 395 U.S. 759, 89 S.Ct. 1426, 22 L.Ed.2d 709.

16. The Board has been criticized for insisting on its ideal "laboratory conditions" standard. *See* Samoff, *supra* note 9 at 234-236; Aaron, Labor Relations Law in Challenges to Collective Bargaining, 113, 128 (L.Ulman ed. 1967); Bok, The Regulation of Campaign Tactics in Representation Elections Under the National Labor Relations Act, 78 Harv.L.Rev. 38, 40-41 (1964). Mr. Samoff has urged "hearty and unrestricted electioneering, equal access to the voters, and conclusive results," a rather attractive alternative to what he considers the "unattainable goal" of insuring "laboratory conditions." He proposes that the Board adopt a new standard for election conduct (preferably his) by taking advantage of its rule-making power. Samoff, *supra*, at 234, 252. *Cf.* NLRB v. Wyman-Gordon Co., *supra*; Friendly, The Federal Administrative Agencies: The Need for Better Definition of Standards, 75 Harv.L.Rev. 863 (1962). The decision on which standard will best effectuate the Act *is* a determination to be made initially by the Board. But until it indicates otherwise, it is bound, in election objection cases, by its current "laboratory conditions" test.

ing [and conduct] drop[ping] too low, the requisite laboratory conditions [were] not present, and the experiment must be conducted over again." General Shoe Corp., 1948, 77 N.L.R.B. 124, 127. *See* Electra Mfg. Co. v. NLRB, 5 Cir. 1969, 408 F.2d 570; NLRB v. Houston Chronicle Pub. Co., 5 Cir. 1962, 300 F.2d 273.

Enforcement denied.

BELL, Circuit Judge (concurring specially):

I concur in the result announced in the majority opinion.

## ON PETITION FOR REHEARING

### PER CURIAM:

The Board complains that the Court imposes on the Board an "unrealistically 'ideal' standard." We do not so intend. We are in full agreement with the Board's explanations of its "laboratory" standard in Morganton Full Fashioned Hosiery, 1954, 107 N.L.R.B. 1534, 1538,[1] and in Liberal Market, Inc., 1954, 108 N.L.R.B. 1481, 1482.[2]

As indicated later by the Board in International Mfg. Co., 1967, 167 N.L.R.B. No. 105, from which we quoted in footnote 14 to our original opinion, the task is " * * * to evaluate properly the probable effect of conduct which is coercive in nature. * * * The controlling factor here is whether the conduct involved tends to interfere with a free and uncoerced choice by the employees." The test was more elaborately stated by this Court in a case decided shortly after our original decision in the instant case:

" * * * the ultimate question here is not whether any improprieties oc-

curred during the campaign, but whether in the circumstances, the particular conduct complained of 'created an environment of tension or coercion such as to preclude employees from exercising a free choice. For conduct to warrant setting aside an election, not only must that conduct be coercive, but it must be so related to the election as to have had a probable effect upon the employees' actions at the polls.' NLRB v. Zelrich Company, 344 F.2d 1011, 1015 (5th Cir. 1965)."

NLRB v. Golden Age Beverage Co., 5 Cir. 1969, 415 F.2d 26.

Further as recognized in our original opinion:

"Our scope of review is limited to ascertaining whether there is substantial evidence on the record considered as a whole to support the Board's decision and order. 29 U.S.C. § 160(e) and (f). Universal Camera Corp. v. NLRB, 1951, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456, NLRB v. Houston Chronicle Publishing Co., 5 Cir. 1962, 300 F.2d 273."

416 F.2d 394. And still further, "this Court must review, on an *ad hoc* basis, the fairness of the Board's application of its chosen standard." 416 F.2d 395. There is thus no escape from a careful examination of the record in each case to enable this Court to meet its responsibility "for the reasonableness and fairness of Labor Board decisions." Universal Camera Corp. v. NLRB, 1952, 340 U.S. 474, 490, 71 S.Ct. 456, 466, 95 L.Ed. 456. On petition for rehearing we have again reviewed the record and, for the reasons stated in the original opinion, we adhere to our conclusion that the Board's

---

1. " * * * the adoption of a laboratory standard should not be construed to mean that the Board will ignore the realities of industrial life. In this respect, we are not unmindful of the fact that the 'laboratory' for election purposes is usually an industrial plant where vigorous campaigning and discussion normally take place * * * "

2. "In deciding whether the registration of a free choice is shown to have been unlikely, the Board must recognize that Board elections do not occur in a laboratory where controlled or artificial conditions must be established. We seek to establish ideal conditions insofar as possible, but we appraise the actual facts in light of realistic standards of human conduct."

order is not supported by the record considered as a whole.

The petition for rehearing is denied and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12), the Petition for Rehearing En Banc is denied.