**MIDWEST STOCK EXCHANGE, Incorporated; Midwest Clearing Corporation; Midwest Securities Trust Company; and Midwest Stock Exchange Service Corporation, Petitioners,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 79–1501.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 10, 1980.

Decided May 2, 1980.

Lawrence D. Ehrlich, Chicago, Ill., for petitioners.

Allison W. Brown, Jr., NLRB, Washington, D. C., for respondent.

Joseph E. Finley, Princeton, N. J., for inter-respondent.

Before PELL, Circuit Judge, PECK, Senior Circuit Judge,* and WOOD, Circuit Judge.

PECK, Senior Circuit Judge.

This case is before the Court on a petition by Midwest Stock Exchange, Inc., Midwest Clearing Corporation, Midwest Securities Trust Company, and Midwest Stock Exchange Service Corporation (the Exchange) to review, and a cross-application of the National Labor Relations Board (the Board) to enforce an order issued by the Board against the petitioners. The order directs the Exchange to bargain collectively with Local 28 of the Office and Professional Employees International Union (the Union). It rests on the Board's decision that the Exchange's refusal to bargain with the Union constituted an unfair labor practice in violation of sections 8(a)(1) and 8(a)(5) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1), (5).

The Board's order is entitled to enforcement unless the Union was improperly certified by the Board as the collective bargaining representative of the Exchange's employees. *Celanese Corp. of America v. N. L. R. B.*, 291 F.2d 224 (7th Cir. 1961), *Monmouth Medical Center v. N. L. R. B.*, 604 F.2d 820 (3rd Cir. 1979). We hold that the Board's certification of the Union in this case is inconsistent with its declared policy as established by its previous decisions, and we deny enforcement.

On September 12, 1977, the Union filed a representation petition with the Board seeking certification as the bargaining representative of all full and part-time office

---

* Honorable John W. Peck, Senior Circuit Judge of the United States Court of Appeals for the Sixth Circuit, sitting by designation.

and clerical workers of the Exchange. An election was held on January 25, 1978, and the Union won the election by a vote of 182 to 149; 28 challenged ballots were resolved by stipulation of the parties.

The Exchange timely filed objections to conduct affecting the results of the election, alleging among other things, that (1) the Union interfered with the election through the electioneering activity of its authorized "election observer," Jonathan James, at and away from the polling area, and (2) the Board's failure to control James's activities in the polling area constituted misconduct warranting a new election. Subsequently, a hearing was held to resolve these two issues.

The hearing officer made findings of fact based on the testimony of several witnesses, including Exchange observer Sonja Griffin, Board agents assigned to the election, employees who voted in the election, and Jonathan James, the Union observer. With few exceptions, petitioners do not here dispute the factual findings of the hearing officer; what they do contest are the conclusions drawn from the facts as established. Because our disposition of this case is based solely on the facts as found, the facts appearing hereinafter are extracted exclusively from the Report of the hearing officer, as adopted by the Board.

## I

The hearing officer found that James engaged in conversations with several voters during the course of the election. On one occasion, three voters greeted James, who was seated at the time in the corridor outside the voting room, upon entering the voting area. After a brief exchange, the three men joined the line of employees waiting to vote. When they emerged from the voting room, they dallied in the corridor, and James approached and spoke with them for about one minute before a Board agent interrupted and ended the conversation.

Shortly thereafter, a noisy group of seven or eight employees got in line to vote. James "whispered" to a female in the group. More than a few words were spoken, but the conversation apparently lasted less than a minute. There was no evidence as to the content of the conversation. The voting line consisted of from ten to fifteen voters during both conversations cited above.

In another incident, a young man joined the voting line, greeted James, and then began talking to him about work, though there was no testimony as to any specific comments made. The conversation then turned to "friendly banter." The entire incident lasted from three to five minutes and took place in the presence of fifteen voters. Again the conversation ended when a Board agent intruded and asked James to "cut his conversations short."

The lengthiest conversation occurred early in the voting process. Mrs. Jerri Thomas, accompanied by her four-year-old daughter, was standing in the voting line, which consisted of from five to twenty persons. James was seated in the corridor, opposite the voting line and next to Sonja Griffin, the employer's observer. As the hearing officer found:

Jerri Thomas greeted James with "what's happening?" He replied, "Nothing." Thomas thereafter asked him what he was doing there, and he explained that he was an observer. He then asked her what she had done the previous night, and inquired why she had her little girl with her. . . . Thomas replied that she would be taking her child home and probably returning to work later. Thomas then asked James whether he would watch the girl while she went in to vote. James said "Yes," and Thomas commented that she would be right back. Griffin estimated that the entire conversation lasted 5 minutes. During this time, Thomas also conversed with other voters, and James was greeted by an unidentified voter.

The babysitting of Thomas' daughter is another incident of which petitioners complain. After James agreed to watch Thomas' daughter, the girl crossed the hallway and sat on James's lap, where she remained

until her mother returned from the voting room. The time that elapsed during this incident was estimated by one witness to be four minutes and by another to have been fifteen to twenty minutes, though the hearing officer made no specific finding as to the length of the episode. While on James's lap, the girl chatted with him and the two played with a toy bank containing a few pennies.

The final specific instance of conduct that petitioners allege invalidated the election occurred away from the polling area, but, arguably, on the "line of march" to the polling place. Having earlier asked a Board Agent's permission to leave for lunch, James left the polling area about two hours after the voting had commenced. James traveled by elevator from the 12th floor, where the election was being held, to the lobby and continued to the basement by way of the stairs. James proceeded to a locker room in the basement where he took off his observer's badge and put it in his pocket. The hearing officer found that James engaged in a three-minute conversation with three employees in the lobby. The content of that conversation was not disclosed.

Board agent Hoffman, one of the agents responsible for the conduct of the election, estimated that he admonished James to refrain from conversing with employees waiting to vote on no less than six occasions, and that, as the hearing examiner found, several other incidents escaped detection.

After applying what she deemed to be the relevant principles of law to the facts as found, the hearing officer recommended that petitioners' objections be overruled on the grounds that the conversations of the Union observer with employees were merely brief, innocuous exchanges and did not involve the appearance of electioneering, and the observer's performance of child care services was only a courtesy performed in response to a request. She further recommended that the Union be certified to represent petitioners' employees. The exchange filed Exceptions to the Hearing Officer's Report, but a three-member panel of the Board unanimously affirmed the Report, without opinion, and certified the Union as the exclusive bargaining representative of the Exchange's clerical and office employees.

The Exchange refused to bargain with the Union, and an unfair labor practice hearing was commenced. The Exchange defended its refusal to bargain on the ground that the Board's certification was invalid and that the Exchange, therefore, was under no legal obligation to bargain with the Union. The Board rejected this argument, granted the Regional Director's Motion for Summary Judgment against the Exchange, and issued the order to bargain which is the subject of the petition presently before this Court.

## II

The first question of law to be addressed is the scope of judicial review of Board orders respecting the validity of representation elections. The Board asserts that the court must limit its inquiry to whether the Board's determination falls within its "wide degree of discretion," and petitioners must show that the Board clearly abused its discretion in overruling petitioner's objections.

This Court has explained clearly the balance between the Board's discretion to establish rules governing election procedures and the Court's obligation to review the Board's application of those rules. In *Celanese Corp. of America v. N. L. R. B.*, 291 F.2d 224, 225 (7th Cir. 1961), this Court held that the Board's "wide discretion" lies in the initial promulgation of rules and regulations establishing the procedures and safeguards for conducting representation elections. *See also N. L. R. B. v. A. J. Tower Co.*, 329 U.S. 324, 330, 67 S.Ct. 324, 91 L.Ed. 322 (1946). We went on to say, however, that the courts of appeals bear the responsibility of reviewing the Board's specific application of its rules. 291 F.2d at 225. "Judicial review in these cases is not concerned with the wisdom of the Board's policy but must determine whether the record as a whole supports the findings and conclusions respecting compliance with the policies,

rules, and regulations promulgated by the Board." *Id. See also N. L. R. B. v. Mosey Mfg. Co., Inc.*, 595 F.2d 375, 377 n. 5 (7th Cir. 1979).

■ The Board is not forever bound by its prior declarations of policy, and is free, for example, to exercise its discretion to alter its rules when, in the wisdom gained through experience, it concludes that its rules have failed to effectively safeguard elections or when it finds a rule to be unduly burdensome. *N. L. R. B. v. Mosey, supra*, 595 F.2d at 375. Where the Board has promulgated standards governing the conduct of an election, however, those standards are controlling until the Board announces a change and its reason for the change. *See Delta Drilling Co. v. N. L. R. B.*, 406 F.2d 109 (5th Cir. 1969). Until such a change is announced, the Board's application of its standards must be reasonably consistent with its previous decisions. *Monmouth Medical Center v. N. L. R. B.*, 604 F.2d 820, 823 (3rd Cir. 1979). The duty of this Court then, is to examine the Board's conclusions in the case before us and determine whether the Board has fairly applied its chosen standard. *Hometown Foods, Inc. v. N. L. R. B.*, 416 F.2d 392, 395 (5th Cir. 1969). It follows that whether we are in agreement with such conclusions of the Board is irrelevant.

### III

Petitioners argue that the conduct in the instant case violates the rule set forth by the Board in *Milchem, Inc.*, 170 NLRB 362 (1968), and that the Board's decision is either a misapplication of the *Milchem* standard to the undisputed facts, or an impermissible departure from its previously stated policies without notice or explanation. We feel compelled to agree.

We begin our analysis by considering the precursor to *Milchem, supra*, establishing the Board's general policy with regard to protecting the integrity of the election process. In *General Shoe Corporation*, 77 NLRB 124, 127 (1948), the Board established the basic standard for evaluating conduct during elections:

In election proceedings, it is the Board's function to provide a laboratory in which an experiment may be conducted, under conditions as nearly ideal as possible to determine the uninhibited desires of the employees. It is our duty to establish those conditions; it is also our duty to determine whether they have been fulfilled. When, in the rare extreme case, the standard drops too low, because of our fault or that of others, the requisite laboratory conditions are not present and the experiment must be conducted over again.

The Board reaffirmed its commitment to insure the integrity of the election process when, in *Milchem, supra*, it declared that elections would be overturned where representatives of any party to the election engaged in "prolonged" conversations with voters waiting to cast their ballots, regardless of the content of the remarks exchanged. 170 NLRB at 362. The Board reasoned that the potential for distraction, last minute electioneering, and unfair advantage, justified a "strict rule" against such conduct, without requiring an examination into the substance or effect of the conversations. *Id.* Recognizing the impossible task of eliminating all conversations in the polling area, the Board stated that its rule would not necessarily void elections upon the occurrence of "any chance, isolated, or innocuous comment." *Id.* at 363. Without defining the point at which a "trifling" comment becomes a prolonged conversation, the Board set aside an election where a union representative had engaged in an estimated five minute conversation. Thus, it is clear that a five minute conversation is not *de minimus* and requires a second election. *See Sonoco Products Co. v. N. L. R. B.*, 443 F.2d 1334, 1337 (9th Cir. 1971).

■ We need look no further than to the conversation between James and Mrs. Thomas to reach the conclusion that the Board without explanation departed from *Milchem* in the present case. Exchange observer Sonja Griffin estimated, and the Board credited her testimony, that James

spoke to Mrs. Thomas for five minutes. Nevertheless, the hearing officer concluded that *Milchem* was not violated because this was not a "prolonged" conversation. The hearing officer sought to further distinguish *Milchem* by stating that the incident did not involve "a one-to-one conversation: other voters took part at will." Finally, the hearing officer declared that the circumstances in the present case did not "even suggest the appearance of electioneering, the basis for the *Milchem* proscription of conversation."

However, given the facts as found by the Board, its conclusions based thereon are irreconcilable with the result in *Milchem*. First, though the Board in *Milchem* did not attempt to designate the transition point between a "trifling" comment and a "prolonged" conversation, it unquestionably concluded that a five minute conversation falls within the latter category. The Board has failed to explain to this Court's satisfaction how a five minute conversation can be prolonged in one instance and not prolonged in another. In the absence of a Board announcement of a change in the *Milchem* standard and its reason for the change (the Board does not contend that it has overruled *Milchem*), it is our judgment that the Board misapplied its established rule.

The Board asserts that it followed the dictates of *Milchem*, in approving James's conduct because there was "no appearance of electioneering," the basis for the *Milchem* decision. It argues to this Court that James's remarks were innocuous and there was no potential impact on the voters. The appearance of electioneering, however, was but one of several reasons advanced in *Milchem* for strictly prohibiting conversations of this type. There the Board explained that it was also concerned that voters would be distracted during the final minutes before they cast their vote. These last few moments before voting the Board reasoned, should be the voter's own, "as free from interference as possible"; a time during which a voter can consult his own conscience without interruption. 170 NLRB at 362–363. It was for this reason, as well as its concern with the appearance of election-

eering that might result from prolonged conversations, that the Board adopted a "blanket prohibition" against such conversations, without inquiry into their "substance or effect." *Id.* Thus, the Board here perverted *Milchem* insofar as its decision was predicated in anywise upon a consideration of the content of James's conversation or the appearance of his conduct.

■ The cases relied upon by the Board, *see, e. g., N.L.R.B. v. Bostik Division USM Corp.*, 517 F.2d 971 (6th Cir. 1975), are not to the contrary. They simply make explicit what was implicit in *Milchem*. That is, where conversations are of a much shorter duration than the one condemned in *Milchem*, *Milchem's* per se rule is not applicable, and it becomes necessary to make a case-by-case inquiry into the nature and effect of the conversations, which inquiry must be tempered by a sense of realism. *See also Century City Hospital*, 219 NLRB 52 (1975); *Hecla Mining Co.*, 218 NLRB 61 (1975). *Compare Pastoor Bros. Co.*, 223 NLRB 451 (1976), and *Volt Technical Corp.*, 176 NLRB 832 (1969).

The purported distinctions between *Milchem* and the present case advanced by the Board to justify the result here vanish upon close examination of the facts which existed in *Milchem*. Here, the Board found that James and Thomas were intermittently joined in their conversation by other voters; thus, theirs was not a "one-to-one" conversation. Similarly, the evidence in *Milchem* was that the union representative spoke to "several" employees waiting to vote, not just one. Moreover, the offender in *Milchem* was, as in the case at bar, removed a "few feet" from his intended audience. Even were the distinctions drawn in this case real rather than imaginary, they could hardly suffice to avoid the consequences of *Milchem* without eviscerating the rule there set forth.

We stress that we do not here pass upon the wisdom of the *Milchem* rule; our function is merely to test the fairness of the Board's application of its own standard in the case before us. For the reasons stated

above, we hold that the Board's application of its rule was not reasonably consistent with *Milchem* or with its subsequent decisions. Therefore, the Exchange's petition for review is granted, the Board's application for enforcement is denied, and the Board's certification of the Union is vacated.