United States Court of Appeals,

Fifth Circuit.

No. 91–4122.

Alice HOBBS, et al., Plaintiffs–Appellants,

v.

Clarence HAWKINS, etc., et al., Defendants–Appellees.

Aug. 13, 1992.

Appeal from the United States District Court For the Western District of Louisiana.

Before THORNBERRY, GARWOOD, and DAVIS, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

Alice Hobbs, three of her coworkers, and her union appeal the district court's dismissal of their § 1983 class action against Hobbs's employer and various public officials for alleged violations of their statutory and constitutional rights. We conclude that the district court lacked subject matter jurisdiction over alleged violations of rights secured by the federal labor laws, and that plaintiffs have stated a cause of action for deprivation of their First Amendment right to free speech, but not of association. We therefore affirm in part, vacate in part, and remand for further proceedings.

I.

This dispute arose out of a union certification election campaign. In August 1989, the International Ladies' Garment Workers' Union, AFL–CIO (ILGWU or Union) sought to organize the approximately one thousand employees at the Bastrop, Louisiana plant of Ditto Apparel of California, Inc. (Ditto). Ditto opposed the employees' attempt to organize. The Regional Director of the National Labor Relations Board (NLRB or Board) scheduled a certification election for March 16, 1990.

In February and early March 1990, the Union, Ditto, local business leaders, and public officials actively promoted their respective positions on the election. On February 7, the mayor of

Bastrop, Clarence Hawkins, met with certain state officials and local business leaders at the Bastrop City Hall Courtroom to discuss the potential unionization of Ditto. On February 24, Hawkins met at City Hall with thirteen Ditto employees who supported the Union in attempt to dissuade them from organizing. Plaintiffs allege that Hawkins threatened them with loss of their jobs if the Union were selected, alluded to a financial relationship between the City and Ditto, and promised to help establish a city-run grievance procedure if the workers rejected unionization.

On March 5, an assembly was held at the Bastrop Municipal Center, a city facility. The meeting was advertised at the Ditto plant and on the front page of Bastrop's only newspaper, and was open to all Ditto employees and their families. The meeting was financed by the Morehouse Economic Development Corporation (MEDCO), a nonprofit corporation organized to encourage business development in Morehouse Parish.[1] The complaint alleges that approximately 200 employees attended the March 5 meeting. John Bonds, a former mayor of Bastrop and an officer of MEDCO, chaired the meeting and told the crowd that he was representing Mayor Hawkins. Also attending and participating at the meeting were all five of Bastrop's city councilpersons; Lawrence Wilson, of the Louisiana Department of Employment and Training, Division of Employment Security; Sue Gewin, of the Louisiana Department of Health and Hospitals, Office of Eligibility Determination; and Ivory Smith, a state official in charge of the local Head Start program and a member of MEDCO's board of directors. The complaint also alleges that certain Ditto employees known to oppose unionization were seated prominently and featured as speakers at the meeting.

All of the speakers at the March 5 meeting spoke out against unionization. The speakers warned of strikes, plant closure, and loss of jobs and other benefits such as welfare and unemployment compensation, if the Union were elected. The complaint alleges that plaintiff Hobbs and other Union supporters "were prohibited from speaking and all requests to address the assembly

---

[1]MEDCO is financed in part by the City of Bastrop, other parish government entities, and local businesses, including Ditto.

or the officials were denied."

The employees rejected Union representation at the March 16 election, 443–317.

The Union filed unfair labor practice charges with the Board and asked that the election results be set aside. Although the Regional Director refused to issue a complaint on the unfair labor practice charges, the hearing officer found that a coercive environment had so tainted the election process that a new election was warranted. The NLRB endorsed the hearing officer's recommendation and ordered a new election.

Meanwhile, in June 1990, plaintiffs brought this suit in federal court against Ditto, the City of Bastrop, Hawkins, three city councilpersons, Wilson, Gewin, and MEDCO. Count 1 of the complaint seeks relief under 42 U.S.C. § 1983 for violations of the plaintiff's rights under sections 7 and 9 of the National Labor Relations Act (NLRA or Act), 29 U.S.C. §§ 157 and 159. Count 2 seeks relief under § 1983 for violations of plaintiffs' First Amendment rights of speech and association.[2] Count 3 seeks pendent relief under Louisiana constitutional and statutory law. Plaintiffs request declaratory and injunctive relief, compensatory damages of $1 million, punitive damages of $2 million, and attorney's fees. The district court granted defendants' motions to dismiss Count 1 under Federal Rules of Civil Procedure 12(b)(1) and Count 2 under Rule 12(b)(6). After dismissing the pendent state claims as well, the district court entered a final judgment in February 1991. Plaintiffs timely appealed against all defendants.[3]

II.

_____

[2]Count 2 also alleges a violation of equal protection of the law. We consider plaintiffs to have waived their equal protection argument, however, because they have not addressed it in their briefs.

[3]Plaintiffs subsequently settled with defendant MEDCO and have dismissed their appeal with respect to MEDCO.

The district court concluded that it lacked jurisdiction over Count 1 of the complaint because the conduct complained of fell within the NLRB's exclusive jurisdiction. We review de novo the district court's dismissal under Rule 12(b)(1). We will not affirm the dismissal "unless it appears certain that the plaintiff[s] cannot prove any set of facts in support of [their] claim which would entitle [them] to relief." *Benton v. United States,* 960 F.2d 19, 20 (5th Cir.1992).

Whether a § 1983 remedy lies for violations of NLRA rights committed during an organizing campaign is an issue of first impression. The Supreme Court's recent decision of *Golden State Transit Corp. v. City of Los Angeles,* 493 U.S. 103, 110 S.Ct. 444, 107 L.Ed.2d 420 (1989) (*Golden State II*), provides our starting point. The City of Los Angeles had conditioned the renewal of a taxicab franchise on the company's resolution of a labor dispute with its union. Ultimately, the Supreme Court held that the City was prohibited from conditioning the license in that way. *Golden State Transit Corp. v. City of Los Angeles,* 475 U.S. 608, 106 S.Ct. 1395, 89 L.Ed.2d 616 (1986) (*Golden State I* ) (relying on preemption doctrine of *Machinists v. Wisconsin Employment Relations Comm'n,* 427 U.S. 132, 96 S.Ct. 2548, 49 L.Ed.2d 396 (1976)). The company then sued the city for damages under § 1983. That suit culminated in *Golden State II,* wherein the Court addressed whether the NLRA grants rights enforceable under § 1983.

The Court began by noting that the remedy of § 1983 "encompasses violations of federal statutory as well as constitutional rights" and that § 1983's coverage "must be broadly construed." *Golden State II,* 493 U.S. at 105, 110 S.Ct. at 448. The Court then articulated a two-part test to determine whether a § 1983 remedy exists: (1) if plaintiff asserts the "violation of a federal right," then a § 1983 remedy exists unless (2) defendant can show that " "Congress specifically foreclosed a remedy under § 1983' by providing a "comprehensive enforcement mechanis[m] for protection of a federal right.' " *Id.* at 106, 110 S.Ct. at 448 (quoting *Smith v. Robinson,* 468 U.S. 992, 1003, 1005 n. 9, 104 S.Ct. 3457, 3463, 3464 n. 9, 82 L.Ed.2d 746 (1984)); see also *Wilder v. Virginia Hospital Ass'n,* 496 U.S. 498, 508, 110 S.Ct. 2510, 2517, 110 L.Ed.2d 455, 466 (1990). Thus once plaintiff

has asserted the violation of a federal right, there is a presumption that a § 1983 remedy is available.

Plaintiffs allege the violation of sections 7 and 9 of the Act. We address each cause of action separately.

A.

We first address plaintiffs' § 1983 cause of action alleging a violation of their § 9 right to a free election. Assuming without deciding that § 9 grants a "right" cognizable under § 1983, we conclude that plaintiffs cannot maintain this cause of action because Congress has provided a comprehensive enforcement mechanism for protection of this right. We recognize that "[t]he issue is not the intent of Congress to permit a section 1983 action, but rather the intent of Congress to withdraw the existing section 1983 remedy." *Victorian v. Miller,* 813 F.2d 718, 721 (5th Cir.1987) (en banc). Although we do not lightly infer such intent, *id.,* we find such intent here in the form of a congressional directive to vest in the Board exclusive authority over this issue.

Section 9 addresses the role and selection of representatives. 29 U.S.C. § 159. "Congress has entrusted the Board with a wide degree of discretion in establishing the procedure and safeguards necessary to insure the fair and free choice of bargaining representatives by employees." *NLRB v. A.J. Tower Co.,* 329 U.S. 324, 330, 67 S.Ct. 324, 328, 91 L.Ed. 322 (1946). The Board defines the bargaining unit (§ 9(b)), investigates petitions for certification (§ 9(c)), and conducts representative elections (§§ 9(c) and (e)). A Board-designated representative is the "exclusive" representative of all employees in the unit (§ 9(a)).

The Board will invalidate an election if it finds that circumstances rendered a "free expression of choice" of representative impossible. *Steak House Meat Co.,* 206 NLRB 28, 29 (1973). The Board will consider all relevant conduct, including the conduct of third parties, when assessing the impact on the employees' freedom of choice. *Westwood Horizons Hotel,* 270 NLRB 802, 803 (1984);

*P.D. Gwaltney, Jr.,* 74 NLRB 371, 373 (1947). The Board directed a second election in this case because of third-party conduct, i.e., the conduct of the defendant public officials. No one disputes the Board's authority to re-run the election. But it is precisely this unquestioned authority of the Board to decide the § 9 issue that also precludes plaintiffs' § 1983 claim.

In *San Diego Building Trades Council v. Garmon,* 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959), the Supreme Court established a broad preemption doctrine: "[w]hen an activity is arguably subject to § 7 or § 8 of the Act, the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board if the danger of state interference with national policy is to be averted." *Id.* at 245, 79 S.Ct. at 780. The Supreme Court has examined the *Garmon* preemption doctrine several times. See, e.g., *International Ass'n of Machinists v. Gonzales,* 356 U.S. 617, 78 S.Ct. 923, 2 L.Ed.2d 1018 (1958) (breach of union membership contract); *Linn v. United Plant Guard Workers,* 383 U.S. 53, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966) (suit against union for libel); *Farmer v. United Brotherhood of Carpenters,* 430 U.S. 290, 97 S.Ct. 1056, 51 L.Ed.2d 338 (1977) (intentional infliction of emotional distress through operation of hiring hall); *Sears, Roebuck & Co. v. Carpenters,* 436 U.S. 180, 98 S.Ct. 1745, 56 L.Ed.2d 209 (1978) (trespassory picketing); *Belknap, Inc. v. Hale,* 463 U.S. 491, 103 S.Ct. 3172, 77 L.Ed.2d 798 (1983) (permanent strike replacements suing employer for breach of contract); *Local 926, International Union of Operating Engineers v. Jones,* 460 U.S. 669, 103 S.Ct. 1453, 75 L.Ed.2d 368 (1983) (interference with employment contract); *Communications Workers v. Beck,* 487 U.S. 735, 108 S.Ct. 2641, 101 L.Ed.2d 634 (1988) (duty of fair representation); see also *Windfield v. Groen Div., Dover Corp.,* 890 F.2d 764 (5th Cir.1989) (reviewing *Garmon* progeny).

The Court has permitted exceptions to *Garmon* preemption when the state or federal court will decide issues "that do not threaten significant interference with the NLRB's jurisdiction." *Windfield,* 890 F.2d at 767. These exceptions derive from *Garmon* itself, which excluded from its preemption mandate conduct that is a mere "peripheral concern" of federal labor law or that touches

"deeply rooted" local interests. *Garmon,* 359 U.S. at 243–44, 79 S.Ct. at 778–79; *Windfield,* 890 F.2d at 767. Although the Court's original articulation of the preemption doctrine referred only to violations of sections 7 and 8,[4] *Garmon,* 359 U.S. at 245, 79 S.Ct. at 779, its underlying rationale, concern for interference with the Board, applies equally to § 9. See also *Jones,* 460 U.S. at 676, 103 S.Ct. at 1458 (restating test without reference to sections 7 or 8); *Belknap,* 463 U.S. at 509, 103 S.Ct. at 3182; *Golden State II,* 493 U.S. at 110 & n. 7, 110 S.Ct. at 451 & n. 7; *Linn,* 383 U.S. at 63, 86 S.Ct. at 663 (noting that conduct in question could lead to invalidation of election).

In *Sears,* the Court refined the *Garmon* preemption test for conduct that is, as here, arguably prohibited by the Act:

> The critical inquiry [ ] is not whether the State is enforcing a law relating specifically to labor relations or one of general application but whether the *controversy presented to the state court is identical to ... or different from ... that which could have been, but was not, presented to the Labor Board.* For it is only in the former situation that a state court's exercise of jurisdiction necessarily involves a risk of interference with the unfair labor practice jurisdiction of the Board which the arguably prohibited branch of the *Garmon* doctrine was designed to avoid.

436 U.S. at 197, 98 S.Ct. at 1757–58 (emphasis added).[5] Thus we look at the "controversy" presented to the court and ask whether the Board could have adjudicated it instead.

*Local 926, International Union of Operating Engineers v. Jones,* 460 U.S. 669, 103 S.Ct. 1453, 75 L.Ed.2d 368 (1983), illustrates how the Court compares the controversy before the court and the controversy that could have been presented to the Board. In *Jones,* a supervisor filed an unfair labor practice against the union alleging that the union had procured his discharge and had coerced his employer in the selection of its bargaining representative. The supervisor also filed a state

---

[4]We also note that this court has questioned in dicta whether *Garmon* applies to § 9 violations. *Windfield,* 890 F.2d at 765 n. 2.

[5]Although the Court addressed preemption of a state court suit in *Sears,* the same principles apply to *Garmon* preemption of suits in federal court. *Garmon,* 359 U.S. at 245, 79 S.Ct. at 779; *Communications Workers v. Beck,* 487 U.S. 735, 742, 108 S.Ct. 2641, 2647, 101 L.Ed.2d 634 (1988).

law action alleging that the union had interfered with his employment contract and caused his discharge. The Supreme Court concluded that the NLRA prohibits coercive union-caused discharges and that state law prohibited both coercive and noncoercive union-caused discharges. The Court held that the court suit was preempted because it was the same "in a fundamental respect" with the unfair labor practice claim in that both required proof that Jones's discharge was caused by the union. *Id.* at 681, 103 S.Ct. at 1461.

We conclude that plaintiffs' § 1983 suit for a violation of § 9 is the same in a "fundamental respect" with the Board's § 9 adjudication. A suit for damages for violation of plaintiffs' § 9 right to a free election would necessarily entail a finding that plaintiffs' § 9 rights were, in fact, violated. But Congress intended the Board to make such determinations, not courts. Congress's unwillingness to let courts decide when a representative election is tainted is seen by the barriers it has erected around the Board's process.

After the election ballots are tallied, any party has seven days to lodge an objection to the election with the Board. 29 C.F.R. § 102.69(a) (1991). The Board then investigates the objections, and may conduct a hearing. §§ 102.69(c) and (d). A Board decision to certify the election results is not directly reviewable by the courts. *AFL v. NLRB,* 308 U.S. 401, 60 S.Ct. 300, 84 L.Ed. 347 (1940). Rather, review must be sought circuitously. If, for instance, an employer seeks judicial review of the union's victory, it must refuse to bargain with the union, wait for the union to file an unfair labor practice charge with the Board for the employer's refusal to bargain, wait for the Board to order it to bargain, and then seek review of that order. *Trailmobile Div., Pullman Inc. v. NLRB,* 379 F.2d 419, 421 n. 3 (5th Cir.1967); *Boire v. Greyhound Corp.,* 376 U.S. 473, 476–77, 84 S.Ct. 894, 896–97, 11 L.Ed.2d 849 (1964). "Congress explicitly intended to impose precisely such delays" in order "to prevent attrition of union support caused by delay in the commencement of collective bargaining." *Boire,* 376 U.S. at 477–78, 84 S.Ct. at 897; *NLRB v. ARA Services, Inc.,* 717 F.2d 57, 63 (3d Cir.1983) (en banc); *NLRB v. Lovejoy Indus., Inc.,* 904 F.2d 397, 402 (7th Cir.1990). Even

when the issue eventually reaches a court, this court's review is "narrowly restricted." *Independent, Inc. v. NLRB,* 406 F.2d 203, 206 (5th Cir.1969). In recognition of the Board's wide discretion in conducting and supervising elections, we would review the Board's decision only for an abuse of discretion. *Id.*

Plaintiffs would have us circumvent this elaborate mechanism for supervising elections, and determining when they represent the employees' free choice, by permitting suits directly under § 9. We conclude that Congress has foreclosed this remedy. As a party to the election, plaintiffs were entitled to—and, in fact, did—lodge an objection with the Board claiming that the election did not represent the free choice of the employees. Plaintiffs now want damages from defendants for the violation of their § 9 right to a free election to supplement the granting of a second election. It is true that the Board could not and did not award plaintiffs damages for the violation of their right to a free election. That fact, however, is not sufficient to overcome the mandate of preemption. *Jones,* 460 U.S. at 684, 103 S.Ct. at 1463; *Garmon,* 359 U.S. at 246–47, 79 S.Ct. at 780–81.

Thus the district court lacked jurisdiction over plaintiffs' § 1983 action predicated on a violation of their § 9 right to a free election.

### B.

We next address plaintiffs' allegation that defendants violated their § 7 rights. We conclude that plaintiffs' § 1983 action predicated on a § 7 violation is also preempted because it is a restatement of and indistinguishable from their § 9 claim.

Defendants do not contest, nor could they, that § 7 grants rights enforceable under § 1983. Section 7, entitled "Rights of Employees," grants employees general rights to organize, to bargain

collectively, and to engage in other concerted activities.[6]  As the Supreme Court stated in *Golden State II,* the NLRA "creates rights in labor and management both against one another and against the State.  By its terms, the Act confers certain rights "generally on employees and not merely as against the employer.' " *Golden State II,* 493 U.S. at 109, 110 S.Ct. at 450 (footnote and citation omitted). Indeed, the question presented in *Golden State II* was whether the rights protected against state interference are "*limited* to those explicitly set forth in § 7." *Id.* (emphasis added).  Although the Supreme Court ultimately answered that question affirmatively, we need not address that analysis because we deal here with the rights explicitly guaranteed by § 7.  We turn, therefore, to the second half of the *Golden State II* test to determine whether Congress has foreclosed this § 1983 remedy on these facts.

The complaint against Ditto, the employer, is disposed of easily.  Plaintiffs' counsel conceded at oral argument that Congress has established a comprehensive enforcement mechanism for protecting plaintiffs' rights from infringement by the employer.  We agree.  Section 8(a) makes it an unfair labor practice, i.e., a violation of rights secured by § 7, for an employer to do any of five things.[7]  Section 8(a)(1) is the broadest proscription, making it an unfair labor practice for an

---

[6]Section 7 provides:

> Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection....

29 U.S.C. § 157.

[7]Section 8(a) provides, in relevant part, that:

> (a) It shall be an unfair labor practice for an employer—
>
> (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7;
>
> (2) to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it ...;
>
> (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor

employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7." 29 U.S.C. § 158(a)(1). Section 8(b), in turn, lists seven acts of labor organizations that constitute unfair labor practices. 29 U.S.C. § 158(b). The Board "has exclusive jurisdiction to prevent and remedy unfair labor practices by employers and unions." *Golden State II,* 493 U.S. at 108, 110 S.Ct. at 450. Plaintiffs had their opportunity to present their § 7 complaint against Ditto to the Board. The complaint against Ditto, then, falls squarely within *Garmon*'s prohibition. Accordingly, we affirm the district court's dismissal of plaintiffs' § 7 claim against Ditto.

That leaves plaintiffs' § 7 claim against the defendant public officials. Section 8, although comprehensive, applies to conduct only of employers and employees, not government officials. Plaintiffs argue to us that these defendants interfered and coerced them in the exercise of their § 7 rights by simultaneously threatening them if they unionized and promising them benefits if they rejected unionization. However, plaintiffs' complaint, upon which jurisdiction is based,[8] inextricably links their § 7 claim to their § 9 claim of a tainted election. The complaint alleges that the March 5 meeting "was intended and did in fact have the effect of coercing members of the classes and otherwise interfering with ... their *rights* under Sections 7 and 9 of the NLRA *to a union representation election free of such coercion and interference.*" Complaint ¶ 25 (emphasis added). The plaintiffs further allege that "[b]ut for the unlawful interference and coercive activities of the defendants, the plaintiffs, the members of the classes and the ILGWU could have conducted a lawful campaign in support of union representation in a free, open and non-coercive atmosphere guaranteed

---

organization ...;

(4) to discharge or otherwise discriminate against an employee because he has filed charges or given testimony under this Act;

(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 9(a).

29 U.S.C. § 158(a).

[8]We emphasize that our review is limited to the question of subject matter jurisdiction. We do not address whether plaintiffs' complaint states a claim for a violation of their § 7 rights.

by the NLRA." *Id.* ¶ 28. Further, Count 1 alleges that defendants "wilfully, deliberately and maliciously violated and conspired to violate the *rights* of the members of the classes and the ILGWU *to a non-coercive union representation election atmosphere free from governmental interference* guaranteed to them, *inter alia,* by Section 1(b) of the Taft–Hartley Act and Sections 7 and 9 of the National Labor Relations Act." *Id.* ¶ 34 (emphasis added). Finally, although plaintiffs allege "direct economic damage" from defendants' conduct, *id.* ¶ 29, the only factual link to these damages is that selection of the Union "through this election process would have resulted in valuable bargaining rights and opportunities for the plaintiffs, the classes and the ILGWU." *Id.* ¶ 17.[9]

The essence of plaintiffs' complaint is that defendants' course of conduct caused plaintiffs to have an election that did not represent their free choice. The economic damages they allege flow from the loss of the election. Plaintiffs have not alleged any facts to support their § 7 claim that are independent from those that relate to the election and which support their § 9 claim. We have already discussed how the Board is quite able to evaluate this conduct under § 9. Thus there is a comprehensive enforcement mechanism in place to protect the right plaintiffs allege has been infringed. It follows that the district court did not err in concluding that it was without jurisdiction over plaintiffs' § 1983 action predicated on a § 7 violation.

### III.

Count 2 of the complaint seeks recovery under § 1983 on grounds that defendants violated plaintiffs' rights of free speech and association guaranteed by the First Amendment. The district court dismissed this claim bottomed on constitutional violations because of a perceived lack of jurisdiction and for failure to state a claim. We address both grounds of decision.

---

[9]The remaining relevant allegations are conclusory or nonspecific and therefore not helpful to plaintiffs. For example, plaintiffs allege that defendants acted pursuant to a policy "of intentional deliberate, and malicious interference with the rights of the classes and the ILGWU." ¶ 30. Paragraph 31 seeks an injunction based on defendants' continuous violation of plaintiffs' § 7 rights.

The district court concluded that the constitutional injuries alleged here were not "separate and distinct from the type of injury protected by the NLRA" and thus were within the Board's exclusive jurisdiction. Defense counsel conceded at oral argument that this was error, and we agree. "Whether or not the NLRB entertains constitutional claims, such claims would not fall within the Board's primary jurisdiction." *Communications Workers v. Beck,* 487 U.S. 735, 744 n. 1, 108 S.Ct. 2641, 2648 n. 1, 101 L.Ed.2d 634 (1988) (internal citations omitted). Thus the district court had jurisdiction to consider plaintiffs' constitutional claims.

We next address the district court's dismissal of the complaint against Ditto. The district court held that no constitutional complaint against Ditto would lie because the requirement of state action was not met. The district court is correct, of course, that acting "under color of" state law is a prerequisite to liability under § 1983.[10] But the defendant need not be an officer of the state to satisfy this requirement; private persons may be held liable under § 1983 if they willfully participate in joint action with state agents. *Dennis v. Sparks,* 449 U.S. 24, 27–28, 101 S.Ct. 183, 186, 66 L.Ed.2d 185 (1980). Alleging a conspiracy between private and public actors satisfies this requirement. *Id.* at 28, 101 S.Ct. at 186; *Smith v. Winter,* 782 F.2d 508, 512 (5th Cir.1986). Plaintiffs' complaint specifically alleges that Ditto conspired with public officials.[11] Thus the constitutional complaint against Ditto cannot be dismissed solely for a lack of state action, but only if dismissal of the complaint against the state actors was proper.

The district court held that "[t]he Constitutional claims against the City and the public officials

---

[10]42 U.S.C. § 1983 provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

[11]The NLRB hearing officer held that the public officials were not "agents" of Ditto under the Act. We need not decide whether "joint action" under § 1983 differs from "agency" under the Act. To survive a Rule 12(b)(6) motion, it is enough that the complaint alleges a conspiracy.

fail to allege a violation of a Constitutionally protected right." We treat this as a dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief may be granted. In reviewing a dismissal under Rule 12(b)(6), we must treat all of the allegations of the complaint as true and construe them in the light most favorable to plaintiffs. *Garrett v. Commonwealth Mortg. Corp. of America,* 938 F.2d 591, 592 n. 2 (5th Cir.1991). We cannot uphold such a dismissal "[u]nless it appears to a certainty that the plaintiffs can prove no set of facts that would entitle them to relief." *Id.* at 593.

## A.

We first address whether plaintiffs have stated a cause of action under § 1983 for deprivation of their right to free speech. Plaintiffs base this complaint on defendants' refusal to allow pro-Union supporters to speak at the March 5 assembly. We conclude that plaintiffs have stated a cause of action.

The complaint alleges that the March 5 meeting took place in a city-owned facility, that the assembly "was planned and orchestrated by the city and state officials and other named defendants," and that "[a]t all times the meeting was characterized and in fact conducted as an official function of the City of Bastrop relative to the ongoing ILGWU representational activity at the Ditto plant." Complaint ¶¶ 25, 22. The complaint specifically alleges that plaintiff Hobbs and other Union supporters "were prohibited from speaking and all requests to address the assembly or the officials were denied." *Id.* ¶ 24. This is enough to invoke the Supreme Court's analytical framework—called "forum analysis"—for determining First Amendment rights with respect to government property, and private property dedicated to public use. See *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 44–46, 103 S.Ct. 948, 954–55, 74 L.Ed.2d 794 (1983); *Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.,* 473 U.S. 788, 797, 105 S.Ct. 3439, 3446, 87 L.Ed.2d 567 (1985).[12]

---

[12]*Cornelius* was decided by a four-justice plurality in a case in which two justices did not participate. In dissent, Justices Blackmun and Brennan agreed with the analytical framework of the plurality, but disagreed with the plurality's application of the framework to the facts of that

There are three classifications of fora. First is the "traditional public forum." *Cornelius,* 473 U.S. at 802, 105 S.Ct. at 3449; *Perry,* 460 U.S. at 45, 103 S.Ct. at 954. Traditional public fora "are those places which "by long tradition or by government fiat have been devoted to assembly and debate.' Public streets and parks fall into this category." *Cornelius,* 473 U.S. at 802, 105 S.Ct. at 3449 (quoting *Perry,* 460 U.S. at 45, 103 S.Ct. at 954). The next type of forum is "the public forum created by government designation." *Cornelius,* 473 U.S. at 802, 105 S.Ct. at 3449. This type of forum "may be created by government designation of a place or channel of communication for use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects." *Id.* To label a forum as public-by-designation, a court must ascertain whether the government "intended to designate a place not traditionally open to assembly and debate as a public forum." *Id.* The third category is the "nonpublic" forum. *Id.* at 803, 105 S.Ct. at 3449. This is the residual class of government-owned property, to which the First Amendment does not guarantee access. A court applies strict scrutiny to government restrictions of speech in a traditional or designated public forum, but will approve such restrictions in a nonpublic forum as long as they are "reasonable in light of the purpose served by the forum and are viewpoint-neutral." *Id.* at 800, 806, 105 S.Ct. at 3447, 3451; *Perry,* 460 U.S. at 45, 46, 103 S.Ct. at 954, 955.

We need not and do not classify the March 5 assembly at this time. Our review is limited to determining whether plaintiffs have alleged facts sufficient to survive a Rule 12(b)(6) dismissal. It is enough for us to state that an action subject to forum analysis is not readily susceptible to summary dismissal. See *Stewart v. District of Columbia Armory Bd.,* 863 F.2d 1013, 1018 (D.C.Cir.1988) (forum analysis raises "inherently factual issues that cannot be resolved on a Rule 12(b)(6) motion"); *Searcey v. Crim,* 815 F.2d 1389, 1392–93 (11th Cir.1987) (summary judgment inappropriate for forum analysis). This is particularly true where, as here, the complaint alleges viewpoint discrimination, because viewpoint discrimination violates the First Amendment regardless of the forum's classification. See *Cornelius,* 473 U.S. at 806, 812, 105 S.Ct. at 3451, 3454 (despite holding

case. See 473 U.S. at 813, 105 S.Ct. at 3454 (Blackmun, J., dissenting).

that charity drive was nonpublic forum, remand needed to determine whether defendants excluded plaintiffs from participating in charity drive because of plaintiffs' viewpoint); *Professional Ass'n of College Educators v. El Paso County Community College Dist.,* 730 F.2d 258, 263 (5th Cir.1984).

The district court held that prohibiting plaintiffs from speaking at the March 5 meeting was not unconstitutional because they were free to have their own pro-union rally elsewhere. That fact, however, does not excuse an otherwise impermissible restriction on speech. "[O]ne is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 556, 95 S.Ct. 1239, 1245, 43 L.Ed.2d 448 (1975) (quoting *Schneider v. State,* 308 U.S. 147, 163, 60 S.Ct. 146, 151, 84 L.Ed. 155 (1939)).[13]

Plaintiffs have raised a colorable First Amendment violation of their right to free speech. We therefore vacate the district court's dismissal of this claim at this pleading stage of the case.

B.

We next address plaintiffs' contention that defendants violated their First Amendment right of association through threats and promises. We agree with the district court that plaintiffs have failed to state a claim for a constitutional violation.

The Supreme Court has recognized two strands of the constitutional right of association.

---

[13]We recognize that, even in a public forum, the State may "enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Perry,* 460 U.S. at 45, 46, 103 S.Ct. at 955. Thus, we do not suggest that the chair must always recognize everyone who wants to speak on the issue under discussion. Here, however, the plaintiff alleged that *no* one was allowed to speak in favor of the Union. Reading the complaint broadly, it can be understood to assert, albeit with some generality, that those who prohibited plaintiffs from speaking did so as state actors and under color of law. The district court's error stems from its belief that the plaintiffs' opportunity to have their own meeting elsewhere satisfied their free speech rights as a matter of law.

*Roberts v. United States Jaycees,* 468 U.S. 609, 617–18, 104 S.Ct. 3244, 3249–50, 82 L.Ed.2d 462 (1984). The first involves "choices to enter into and maintain certain intimate human relationships" and is a "fundamental element of personal liberty." *Id.* at 617–18, 104 S.Ct. at 3249. The second strand grants associational rights derivative of the First Amendment rights of speech, assembly, petition for the redress of grievances, and exercise of religion. "The Constitution guarantees freedom of association of this kind as an indispensable means of preserving other individual liberties." *Id.* at 618, 104 S.Ct. at 3249. Plaintiffs' claims fall within the second strand of the Supreme Court's bifurcation. See *id.* at 619, 104 S.Ct. at 3250 (noting that first strand epitomized by "certain kinds of highly personal relationships" such as marriage and family).

The First Amendment clearly guarantees the right to join a union and to advocate in favor of unionization. *Thomas v. Collins,* 323 U.S. 516, 532, 65 S.Ct. 315, 323, 89 L.Ed. 430 (1945). Plaintiffs have not alleged sufficient facts, however, to demonstrate that these rights were abridged. They were not prohibited from joining a union. Compare *Vicksburg Firefighters Ass'n v. City of Vicksburg, Miss.,* 761 F.2d 1036, 1039 (5th Cir.1985) (freedom of association implicated when city prohibits captains from joining union); *Howard Gault Co. v. Texas Rural Legal Aid, Inc.,* 848 F.2d 544, 567 (5th Cir.1988) (unconstitutional to prohibit employees from forming minority union). No tax, license, or penalty was imposed for advocating unionism. Compare *Thomas,* 323 U.S. 516, 65 S.Ct. 315 (unconstitutional to require union organizer to obtain license before advocating unionism). Plaintiffs do allege that defendants prohibited them from speaking at the March 5 assembly. We recognized in the previous section that this states a claim for a violation of plaintiffs' right to free speech, but in the context of all facts alleged, this alone is insufficient to state an additional violation of plaintiffs' right of association. Plaintiffs have not alleged any further hindrance to their ability to hold pro-Union meetings. In short, plaintiffs have not alleged how defendants' actions so limited their ability to speak, to advocate, or to assemble as to violate their right of association.

Plaintiffs allege that defendants threatened them with plant closure and loss of unemployment

and welfare benefits if the Union were selected, and promised a city-run grievance committee if the Union were rejected. Such threats and promises may violate the NLRA, "[b]ut the First Amendment is not a substitute for the national labor relations laws." *Smith v. Arkansas State Highway Employees,* 441 U.S. 463, 464, 99 S.Ct. 1826, 1828, 60 L.Ed.2d 360 (1979) (per curiam). That the defendants' conduct "might well be unfair labor practices ... hardly establishes that such procedures violate the Constitution." *Id.*

Plaintiffs' reliance on *Bates v. City of Little Rock,* 361 U.S. 516, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960), is misplaced. In *Bates,* as in *NAACP v. Alabama ex rel. Patterson,* 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958), the Supreme Court found unconstitutional a government entity's demand for the NAACP's membership list. Those cases recognized the important link between the freedom to associate and the privacy of one's associations, *Bates,* 361 U.S. at 523, 80 S.Ct. at 416; *Patterson,* 357 U.S. at 462, 78 S.Ct. at 1171, something not at issue here. The freedom of association was burdened in those cases by retaliation against the group's members *because of* their membership in the group. See also *Lyng v. United Automobile Workers,* 485 U.S. 360, 367 n. 5, 108 S.Ct. 1184, 1190 n. 5, 99 L.Ed.2d 380 (1988) ("[e]xposing the members of an association to physical and economic reprisals or to civil liability *merely because of their membership*" poses a danger to associational freedoms) (emphasis added). Here, however, the threatened action concerned all employees, not just the Union members. If the alleged threats were carried out, all Ditto employees would lose their jobs and benefits, even those that voted against unionization or who did not join the Union once selected. Many employees choose not to join a union selected as their representative. Plaintiffs do not allege that Union members were threatened any more than non-members.

Plaintiffs also rely on *NLRB v. Gissel Packing Co.,* 395 U.S. 575, 618, 89 S.Ct. 1918, 1942, 23 L.Ed.2d 547 (1969), for the proposition that coercive threats are not protected by the First Amendment. This is true, but does not aid the plaintiffs. To say that defendants may not use the First Amendment as a shield to avoid liability under § 8(a)(1) of the Act is not to say that coercive threats

affirmatively violate plaintiffs' First Amendment right of association. One does not imply the other.

Because we agree that plaintiffs have not alleged a constitutional violation of their freedom of association, we affirm the district court's dismissal of this aspect of the complaint.

IV.

Finally, the defendant State officials contend for the first time on appeal that they are immune from suit under the Eleventh Amendment. We find this claim to be without merit. First, plaintiffs have stated a cause of action for a violation of their First Amendment rights to free speech. "[A] suit challenging the constitutionality of a state official's action is not one against the State," and is not barred by the Eleventh Amendment. *Pennhurst State School & Hosp. v. Halderman,* 465 U.S. 89, 102, 104 S.Ct. 900, 909, 79 L.Ed.2d 67 (1984) (citing *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908)). Second, plaintiffs have sued the defendant State officials both in their personal and official capacities; the Eleventh Amendment provides immunity only for a State actor's conduct in her official capacity. *Chrissy F. v. Mississippi Dept. of Public Welfare,* 925 F.2d 844, 850 (5th Cir.1991). And third, plaintiffs seek to enjoin defendants from further violations of their First Amendment rights. The Eleventh Amendment does not bar suits for injunctive relief. *Will v. Michigan Dept. of State Police,* 491 U.S. 58, 71 n. 10, 109 S.Ct. 2304, 2311 n. 10, 105 L.Ed.2d 45 (1989).

V.

After the district court dismissed all of plaintiffs' federal claims, it declined to exercise its pendent jurisdiction over the state law claims and dismissed them as well. Because we reinstate plaintiffs' free speech claim, we also vacate the district court's dismissal of plaintiffs' pendent state law claims.

Accordingly, we AFFIRM IN PART, VACATE IN PART, and REMAND this case for

further proceedings consistent with this opinion.