UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 97-30346
_____


JERRY SINGLETARY; RHONDA SINGLETARY,

Plaintiffs-Appellees/Cross-Appellants,

versus

JAMES A. BRUMLEY, JR., Individually, and in his
official capacity as Sheriff of Sabine Parish,

Defendant-Appellant/Cross-Appellee.


_____

Appeal from the United States District Court
for the Western District of Louisiana
(95-CV-1468)
_____
August 12, 1998

Before KING, BARKSDALE, and PARKER, Circuit Judges.

PER CURIAM:[*]

The linchpin for this appeal from a jury verdict in a 42 U.S.C. § 1983 action is whether a sheriff's deputy, who was transferred, allegedly in retaliation for refusing the sheriff's request that the deputy speak to his wife about her opposition, as a city council member, to the sheriff, proved a violation of the deputy's First Amendment rights. We hold that he did not and **REVERSE** and **RENDER** judgment for the defendant, Sheriff James Brumley, on that claim. We **AFFIRM** as to the cross-appeals.

_____

[*] Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

I.

In January 1985, Jerry Singletary (Singletary) was hired as a deputy for the sheriff's department in Sabine Parish, Louisiana, under Sheriff Brumley. Until September 1990, Singletary served as a guard at the parish jail. While so serving, he experienced severe anxiety and depression due to the confinement and his feelings of helplessness, resulting, in part, from prisoner suicide and rape attempts; and, he suffered a heart attack and a stroke.

As a result, Singletary and his wife, Rhonda Singletary, each asked the Sheriff to transfer Singletary from the jail. In September 1990, the Sheriff approved a transfer to the misdemeanor probation office.

In February 1993, Rhonda Singletary was elected to the Many, Louisiana, city council. That May, before taking office in July, she was instrumental in helping pass a sales tax to fund building a new parish jail, which the Sheriff had been seeking. And, in mid-September, she voted in favor of connecting that new jail to the municipal sewage and water service.

At an early November council meeting, the Sheriff requested that the council grant a 50-foot wide right-of-way along Buffalo Drive, which was owned by the city, to allow access to the new jail. At a late November council meeting, Rhonda Singletary moved instead for the council to abandon the right-of-way on Buffalo Drive, with the exception of an asphalt drive then in use. The council voted unanimously in favor of this motion.

The Sheriff testified at trial that he was "a little aggravated" by Rhonda Singletary's actions. In fact, he asked Singletary to "get his wife off of [the Sheriff's] back". Singletary responded that he and his wife kept their working roles separate and that, instead, the Sheriff would have to talk to Rhonda Singletary. The Sheriff felt that Singletary could not "handle" his wife and "couldn't figure out [how] a husband or an employee of [the Sheriff] couldn't go talk to their wife and see if they couldn't ... get it straight".

At an early December council meeting, the Sheriff again requested that the council grant the Buffalo Drive right-of-way. The council voted three to one, with Rhonda Singletary as the sole negative vote, to grant one 32 feet wide.

At a mid-April 1994 council meeting, in response to citizens' complaints about speeding by sheriff's deputies, the council voted to install speed bumps on Buffalo Drive. The Sheriff testified at trial that he was "not really mad" about this vote. Singletary testified, however, that, immediately after the vote, the Sheriff told him to "go to the house and get [his] wife straightened out"; that Singletary again told the Sheriff that he did not "get mixed in council business"; and that the Sheriff stormed out of the office.

In August 1994, the Sheriff asked the council to have the city help pay for repairs to Buffalo Drive, which had been damaged during construction of the new jail. At a council meeting in mid-August, it was tentatively agreed that the repair costs would be

3

divided equally between the city, the sheriff's department, and the police jury; but, the council denied the proposal because specific information about actual costs was not then available.

At a police jury meeting the next day, regarding the cost-sharing plan, Rhonda Singletary expressed concern, stating that the city had already done its part by funding the new jail. Nevertheless, the police jury voted to share in the repair costs.

On 24 August, a local newspaper published Rhonda Singletary's comments to the police jury. At trial, she testified that she received a telephone call that same day in which the caller, identifying himself as Deputy John Rainer, a political opponent of the Sheriff, told her that, if she opposed the Sheriff, her husband would lose his job or be demoted and transferred to the new jail.

Later that same day, Chief Deputy Bobby Brumley, the Sheriff's cousin, informed Singletary that he was to be transferred to the new jail. The Chief Deputy told Singletary that he was not being transferred because of his wife's political opposition, but because he was the most qualified person for the position.

The council met two days later, on 26 August, to vote on whether to share the Buffalo Drive repair costs. Rhonda Singletary told the council that her husband was being victimized because of her opposition to the proposal and that, to avoid any further retaliation, she had no choice but to abstain. The council voted two to one to share in the repair costs.

Singletary testified that he asked the Sheriff not to transfer him, but the Sheriff told him that it was out of his hands and that

4

the Chief Deputy was handling it. The Sheriff testified that his Chief Deputy had originally suggested transferring Singletary because he was the most qualified and had agreed to help out at the new jail.

The doctor who had been treating Singletary for several years advised him to resign due to his previous health problems resulting from working at the old jail. In early September 1994, Singletary did so. The Sheriff testified that he was shocked by the resignation and that he had no reason to believe that Singletary was unhappy about the transfer.

In August 1995, Rhonda and Jerry Singletary filed this action under 42 U.S.C. § 1983 against the Sheriff, in his individual and official capacities. They alleged that the transfer was in retaliation for Rhonda Singletary's opposition to the Buffalo Drive matters; and claimed that the Sheriff's actions violated "their First Amendment rights of free speech, political activities, and freedom of association".

In answer to special interrogatories, the jury found: (1) that Singletary's exercise of his constitutionally protected rights was a substantial or motivating factor in his being transferred to the new jail (and awarded compensatory damages of $2,000); (2) that the Sheriff, in his individual and official capacity, *did not violate* Singletary's constitutional rights (interrogatories 2 and 3); (3) that Singletary's transfer *was not* a constructive discharge; (4) that the Sheriff *did not violate* Rhonda Singletary's constitutional rights; (5) that the Sheriff *did not* act with malice and wilfulness

5

or callous indifference to Rhonda Singletary's constitutional rights; (6) that Rhonda Singletary suffered no damages as a result of the Sheriff's wrongful actions; but, in answer to interrogatory 12, (7) that the Sheriff acted with malice and wilfulness or callous indifference to Singletary's constitutional rights (and awarded punitive damages of $50,000).

Needless to say, the district court ruled that the answers to interrogatories 2, 3, and 12 were inconsistent. In sum, by answering negatively to numbers 2 and 3, but positively to 12, the jury found that the Sheriff did *not* violate Singletary's constitutional rights, but yet acted with malice and wilfulness or with callous indifference concerning those rights.

The court instructed the jurors that the responses to interrogatories 2, 3, and 12 were inconsistent, and gave them an opportunity to change them. The jury next found in the negative as to interrogatory 3 (Sheriff's individual capacity), but in the affirmative as to numbers 2 and 12, finding that the Sheriff, in his *official* capacity, *did* violate Singletary's constitutional rights and in so doing had acted with malice and wilfulness or with callous indifference.

Post-trial, the district court considered whether the Sheriff, in his official capacity, could be held liable for punitive damages. It reasoned that, although "punitive damages are not available against government officials acting in their official capacity", the jury had found that "Sheriff Brumley had acted with malice and he deserved to be punished accordingly". Therefore, the

6

district court reasoned, the inconsistency in the verdict was based on a misunderstanding of the court's instructions; "a logical and probable explanation exist[ed]" for the verdict; and the award of compensatory and punitive damages against the Sheriff was valid.

On the other hand, and concerning the other claims, because the original verdict found that Singletary had not been constructively discharged, the court dismissed that claim with prejudice. And, it held that the original verdict was consistent as to Rhonda Singletary and, therefore, dismissed her claims with prejudice.

After both sides moved unsuccessfully for judgment as a matter of law (as the Sheriff had done at the conclusion of the Singletarys' case-in-chief, as well as at the close of all the evidence), or, in the alternative, for new trial, they appealed. Judgment was stayed pending appeal.

## II.

The Sheriff contends (1) that the first verdict, finding that he had not violated Singletary's constitutional rights, should be reinstated; (2) that, in the alternative, the second verdict, finding him liable in his official capacity, was misinterpreted by the district court and does not support awarding punitive damages; (3) that, in the further alternative, the evidence was insufficient to support finding that Singletary's First Amendment rights were violated by the transfer; and (4) that the punitive damages are excessive.

7

By cross-appeals, the Singletarys maintain that the evidence does not support the jury's finding (1) that Singletary was not constructively discharged; (2) that the Sheriff did not violate Rhonda Singletary's constitutional rights; and (3) that the Sheriff did not act either with malice and wilfulness or with callous indifference to her constitutional rights.

For the reasons discussed *infra*, we conclude that the Sheriff prevails on the liability issues presented by the appeal and cross-appeals. Therefore, we do not reach the other issues raised by the parties.

As discussed *infra*, violations *vel non* of First Amendment rights generally involve issues of law, which we, of course, review *de novo*. On the other hand, for sufficiency of the evidence issues, our standard of review is likewise well-established. We will uphold a jury verdict "unless 'there is no legally sufficient evidentiary basis for a reasonable jury to find' as the jury did". **Hiltgen v. Sumrall**, 47 F.3d 695, 699-700 (5th Cir. 1995) (quoting FED. R. CIV. P. 50(a)(1)).

### A.

Under 42 U.S.C. § 1983, any person who, under color of state law, deprives another "of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress". In short, "an underlying constitutional or statutory violation is a predicate to liability under § 1983".

8

*Johnston v. Harris County Flood Control Dist.*, 869 F.2d 1565, 1573 (5th Cir. 1989), *cert. denied*, 493 U.S. 1019 (1990).

The Sheriff maintains that Singletary did not prove a claim of retaliation for the exercise of his First Amendment rights. In this regard, Singletary's specific First Amendment contentions are unclear. As noted, the complaint states that the Sheriff violated the Singletarys' "First Amendment rights of free speech, political activities, and freedom of association". The pretrial order mentions the Singletarys' "First Amendment rights", but, in the section listing their specific legal contentions, mentions *Rhonda* Singletary's freedom of speech, and, with respect to Jerry Singletary, only that his "right of free association was violated".

The Singletarys' proposed jury instructions stated that they contend that their "rights of free speech, political activity, and association were violated by [the Sheriff] when he demoted [Singletary] because of his wife's political opposition". They later filed an additional proposed instruction explaining the "right of freedom of thought", which "includes both the right to speak freely and the right to refrain from speaking at all", all encompassed by the "broader concept of 'individual freedom of mind'".

The Sheriff's proposed instructions stated that Singletary contended that he was constructively discharged "because of his exercise of the right of free speech" and also mentioned a "free association claim". And, in their objections to the district court's instructions, the Singletarys requested that political

9

activity and/or association be added to the right of free speech listed in those instructions.

The instructions submitted to the jury stated that Singletary claimed that he suffered retaliation because of "his exercise of the right of free speech and association". Moreover, in response to a jury note expressing confusion over what constitutional rights were claimed, and by which plaintiff, the court responded that the rights complained of were (1) "the right to associate with whom one pleases without fear of intimidation or punishment by government officials"; (2) "the right of free speech, that is the right to make known (or [withhold]) one's thoughts"; and (3) "as to Mrs. Singletary - as an elected official, she has the protected right to cast her vote without fear of official/governmental interference".

Along this line, and most significantly, Singletary states here only that his claim is based on his right to free speech; it makes no mention of the right of association with respect to him. But, out of an abundance of caution, and because the First Amendment, which is mentioned *generally* in Singletary's brief and throughout the course of the trial, encompasses both freedom of speech and association, we address both of these rights with respect to Singletary's § 1983 claim.

As noted, First Amendment violations *vel non* generally involve issues of law, at least in part if not in whole; issues of law are reviewed *de novo*. *E.g., Cabrol v. Town of Youngsville*, 106 F.3d 101, 109 (5th Cir. 1997). But, because Singletary's First Amendment claims are in large part fact-driven, it is arguable

10

that, as posed by the Sheriff, they concern sufficiency of the evidence matters. Apparently, that is the manner in which they were treated by the district court.

Of course, no authority need be cited for the fact that we alone determine the proper standard of review. In this instance, because of the quite unique factual backdrop presented, we have reviewed the First Amendment issues under both standards. And, under each, Singletary's claims are wanting.

1.

In determining whether a public employee's speech is afforded First Amendment protection from retaliation, our court employs a three-part test: (1) whether the speech involves a matter of public concern; (2) whether the employee's interest in speaking about public concerns outweighs the employer's interest in efficiency; and (3) whether the employer's decision to discharge the employee was motivated by the employee's speech. *E.g., **Thompson v. City of Starkville, Miss.**,* 901 F.2d 456, 460 (5th Cir. 1990). A First Amendment retaliation claim must allege facts demonstrating that the speech involved a matter of public concern, before we will analyze the reasons for the discharge. **Connick v. Myers**, 461 U.S. 138, 146-47 (1983).

For speech to involve a matter of public concern, the speaker must be acting as a citizen, rather than as an employee addressing merely personal concerns. **Id.** at 147; **Thompson**, 901 F.2d at 465. Whether speech involves a public, rather than a personal, concern is determined by the content, form, and context of the statement,

11

viewed in the light of the entire record. *Connick*, 461 U.S. at 147-48.

Of course, freedom of speech encompasses "both the right to speak freely and the right to refrain from speaking at all". *Wooley v. Maynard*, 430 U.S. 705, 714 (1977); *see* *Jones v. Collins*, 132 F.3d 1048, 1054-55 (5th Cir. 1998). As stated in *Hays County Guardian v. Supple*, 969 F.2d 111, 123 (5th Cir. 1992) (emphasis added), *cert. denied*, 506 U.S. 1087 (1993), this "right to *refrain* from speech is violated when the government compels an individual to *endorse a belief* that [he or she] finds repugnant". *See* *Wooley*, 430 U.S. at 715 (holding unconstitutional New Hampshire statute requiring state motto "Live Free or Die" to be displayed on automobile licence plates, because statute required "public view" of "an instrument for fostering public adherence to an ideological point of view [the individual] finds unacceptable"); *Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241 (1974) (holding that state statute requiring newspaper to publish responses of political candidates criticized by newspaper violated First Amendment); *West Virginia St. Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943) (holding that state statute compelling public school students to participate in public ceremonies saluting United States' flag violated First Amendment).

On two occasions, as detailed *supra*, the Sheriff asked Singletary to "get [his] wife straightened out" so that *she* would "quit causing [the Sheriff] so many problems on [the] jail issue".

12

Restated, the Sheriff was ordering Singletary to get his wife to stop opposing the Sheriff.

The question, for First Amendment purposes, is whether Singletary was being ordered to endorse or support the Sheriff's positions on the issues on which Rhonda Singletary opposed the Sheriff. It can certainly be argued that, indirectly, this is exactly what the Sheriff was doing. If Rhonda Singletary didn't oppose the Sheriff's positions, her other two options were to support them or abstain/take no position. But, for a First Amendment violation, more direct or positive indicators are required. *Cf.* **Nicholson v. Gant**, 816 F.2d 591, 599 (11th Cir. 1987) (holding that First Amendment protects plaintiff's silence when she "clearly expressed her desire not to read [a] prepared statement at [a] political rally"); **Sykes v. McDowell**, 786 F.2d 1098, 1104 (11th Cir. 1986) (deputy's refusal to sign newspaper advertisement endorsing sheriff's campaign was protected speech because "a public employee who positively asserts the right not to speak when ordered to support his employer [politically] is within the protection of the [F]irst [A]mendment").

> For activities to constitute expressive conduct and fall within the scope of the First Amendment, they must be sufficiently imbued with elements of communication. In deciding whether particular conduct possesses sufficient communicative elements to bring the First Amendment into play, we ask whether an intent to convey a particularized message was present and whether the likelihood was great that the message would be understood by those who viewed it.

*Cabrol*, 106 F.3d at 109 (internal quotation marks and citation omitted).

In any event, the answer is found in Singletary's response to the order that he speak to his wife. It was *not* that he did not agree with the Sheriff's position and, therefore, declined to endorse it; instead, it was that Singletary and his wife kept their respective positions separate and he didn't participate in city council matters. As stated in *Jones*, 132 F.3d at 1055, "[n]othing ... indicates that [Singletary] intended [his] silence ... to constitute a statement of any sort".

In sum, Singletary *was not* refraining from endorsing a position on a matter of public concern. Instead, he was only refraining from telling his wife to quit opposing the Sheriff. His reasons for that refusal were not speech-driven; they were for marital agreement/harmony, addressed *infra*.

Again, we would be presented with a different case if, for example, the Sheriff had demanded that Singletary sign a petition challenging Rhonda Singletary's views. But, instead, the Sheriff demanded only that Singletary "straighten out" his wife. In short, Singletary's stated reasons for refusing to do so did not implicate an exercise of speech protected by the First Amendment.

As we stated in *Thompson*, "[t]he rationale behind the public concern requirement is to prevent public employees from relying on the Constitution for redress of personal grievances". 901 F.2d at 461. And, as we are reminded by the Supreme Court in *Connick*,

> [w]hen employee expression cannot be fairly
> considered as relating to any matter of

14

> political, social, or other concern to the
> community, government officials should enjoy
> wide latitude in managing their offices,
> without intrusive oversight by the judiciary
> in the name of the First Amendment.
> ...
> [W]hen a public employee speaks not as a
> citizen upon matters of public concern, but
> instead as an employee upon matters only of
> personal interest, absent the most unusual
> circumstances, a federal court is not the
> appropriate forum in which to review the
> wisdom of a personnel decision taken by a
> public agency allegedly in reaction to the
> employee's behavior.

461 U.S. at 146-47. That is the case here.

2.

Again, the specific First Amendment right on which Singletary relies is unclear from the record and briefs. But, as discussed *supra*, out of an abundance of caution, we also address the right of association.

Although the Constitution does not expressly provide for a right of association, the Supreme Court has long recognized two such constitutional protections: (1) protection of "intimate human relationships", which are "a fundamental element of personal liberty"; and (2) "a right to associate for the purpose of engaging in those activities protected by the First Amendment--speech, assembly, petition for the redress of grievances, and the exercise of religion". **Roberts v. United States Jaycees**, 468 U.S. 609, 617-18 (1984); *see also* **Hobbs v. Hawkins**, 968 F.2d 471, 482 (5th Cir. 1992).

Singletary does not appear to be invoking the second type of associative right, which concerns the "right to associate with

15

others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends". *Roberts*, 468 U.S. at 622.

As for the first type of right of association, it serves to protect "certain kinds of highly personal relationships ... from unjustified interference by the State". *Id.* at 618. Marriage fits within this type. *See* *Zablocki v. Redhail*, 434 U.S. 374, 383-86 (1978). "A defendant can be held liable for violating a right of intimate association only if the plaintiff shows an *intent to interfere* with the relationship." *Morfin v. Albuquerque Pub. Sch.,* 906 F.2d 1434, 1440 (10th Cir. 1990) (emphasis added).

Obviously, no such intent to interfere was shown in this case. The Singletarys' right to the association of marriage was not violated by the Sheriff's orders to Singletary to "straighten out" his wife. Far more than that is required to have a valid claim of this type.

B.

As noted, the cross-appeals are also unfavorable to the Singletarys.

1.

Singletary contends that the transfer to the new jail was a demotion and, therefore, constituted a constructive discharge. Such discharge occurs when the employer makes "working conditions ... so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign". *Bozé v. Branstetter*, 912 F.2d 801, 804 (5th Cir. 1990). This determination

16

is made under an objective, reasonable-person standard. *Id.* (citing **Bourque v. Powell Elec. Mfg. Co.,** 617 F.2d 61, 65 (5th Cir. 1980)).

Singletary was transferred from his position as a misdemeanor probation officer to a position as a day-shift supervisor at the new jail. The new position had the same rank and salary. And, Singletary conceded that he had never been in the new jail before he resigned. In sum, reasonable jurors could find, as they did in this case, that Singletary was not constructively discharged. *See* **Polanco v. City of Austin, Tex.**, 78 F.3d 968, 974 (5th Cir. 1996).

2.

Rhonda Singletary asserts that the evidence does not support the jury's finding no violation of her claimed constitutional rights.

a.

She contends that the Sheriff's retaliation against her husband pressured her to abstain from voting at the 26 August 1994 council meeting on whether to share in repair costs for Buffalo Drive. At oral argument, her counsel conceded that he was unaware of any precedent to support the proposition that the Sheriff's transfer of Singletary, which allegedly intimidated Rhonda Singletary, an elected official, into abstaining from voting, is a violation of *Rhonda Singletary's* First Amendment rights. Nor do we see any basis for this claim. Surely, public officials must be made of sterner stuff. The above-quoted cautions in **Connick** and

17

*Thompson* against finding a First Amendment violation under every bush apply four-fold to this asserted violation.

                                    b.

Rhonda Singletary contends also that the Sheriff violated her right of association in her marriage relationship when he told Jerry Singletary to get her "straightened out".  For the reasons stated *supra*, regarding the identical contention apparently raised by Jerry Singletary, this contention fails.

                                    c.

For the first time in her reply brief, Rhonda Singletary contends that, under Louisiana law, she owns a one-half interest in the community property of her marriage and, therefore, her husband's constructive discharge denied her the benefit of his income.  Needless to say, it is unclear how this argument affects her claimed constitutional violations.  *See **Jenkins v. Carruth***, 583 F. Supp. 613, 616 (E.D. Tenn. 1982) ("The law seems clear that one person may not sue, nor recover damages, for the deprivation of another person's civil rights.").  This contention seems to relate only to the constructive discharge issue; an issue on which, as discussed *supra*, Jerry Singletary does not succeed.  In any event, because this issue was not presented until the reply brief, we do not address it.  *E.g., **NLRB v. Cal-Maine Farms, Inc.***, 998 F.2d 1336, 1342 (5th Cir. 1993) ("[T]his court has repeatedly held ... [that] we will not review arguments raised for the first time in a reply brief.").

## III.

Accordingly, with respect to that part of the judgment pertaining to Jerry Singletary's First Amendment retaliation claim, we **REVERSE** and **RENDER** for Sheriff Brumley; with respect to those parts of the judgment pertaining to Jerry Singletary's constructive discharge claim and Rhonda Singletary's claims, we **AFFIRM**.

*AFFIRMED in PART; REVERSED and RENDERED in PART*